KAVANAUGH, Appellant, v. ST. LOUIS TRACTION COMPANY, Respondent.

St. Louis Court of Appeals, November 5, 1907.

EASEMENTS: Servitudes: Specific Performance. One street railway company contracted with another that the latter might operate its cars over part of the line of the first for a consideration, and the contract showed it was contemplated that such cars should be operated by horse power. The franchise of the company thus acquiring the easement empowered it to use electric power derived from storage batteries, but did not empower it to use a trolley system. Subsequently the company holding the easement received a franchise authorizing it to employ a trolley system of electricity for the propulsion of its cars. A mortgage, executed by the company holding the easement

after the execution of the contract, was foreclosed after the new franchise was granted and the purchaser acquired all the rights of such company under the contract. He then brought a suit against the successor of the street railway company granting the easement to specifically enforce his alleged right under the contract to operate his cars over the defendant's line. *Held*, the plaintiff had no right to operate electric cars propelled by a trolley system over defendant's lines because it changed the character of the servitude. The owner of a dominant estate cannot change the character of the servitude whether such change would be beneficial or injurious to the servient tenement.

Appeal from St. Louis City Circuit Court.—*Hon. William Zachritz*, Judge.

AFFIRMED.

*McKeighan & Watts* for appellant.

*Boyle & Priest* for respondent.

STATEMENT.—This proceeding is in the nature of a suit in equity to compel the specific performance of a contract by the respondent. The contract was entered into June 25, 1888, between the Fourth Street & Arsenal Railway Company and the People's Railway Company, both of which companies at that time were operating street railways in the city of St. Louis by horse power, but it was known to the parties that the People's Company contemplated changing its motive power to the cable system and this was done about April 1, 1890. Those terms of the contract which have any bearing on the present controversy will be copied:

"This agreement, made and entered into this 25th day of June, one thousand eight hundred and eighty-eight, by and between the People's Railway Company (a corporation created and existing under the laws of the State of Missouri) as party of the first part and the Fourth Street & Arsenal Railway Company (also

a corporation created and existing under the laws of Missouri) as party of the second part, Witnesseth:

"Section One. In consideration of the covenants, agreements and stipulations hereinafter contained and to be kept and performed by the party of the second part, the said party of the first part hereby agrees to permit said party of the second part to use that portion of the tracks of the street railway of the party of the first part, located in Fourth street in the city of St. Louis, Missouri, and extending from Chouteau avenue on the south to Morgan street on the north, including any and all switches on or along said portion of said tracks and any turntable at the northern terminus of said tracks, as well as the right to place and maintain a suitable and convenient switch or switches at the intersection of said Fourth street and Chouteau avenue for the purpose of passing the cars of the party of the second part from and to its own tracks (located in Chouteau avenue, east of Fourth street) to and from the tracks of said party of the first part, which are to be used as aforesaid by said party of the second part. . . .

"Section Two. The said party of the first part shall have the right to run its cars to and from its own road over said portion of the tracks of the said party of the first part designated in the first section of this instrument, including any extension or extensions or relocation thereof as aforesaid, and shall have the right to collect and retain all fares from passengers using its cars while passing over said tracks of said party of the first part. Said party of the second part shall so operate its cars on said tracks as not to interfere unnecessarily with the operation by said party of the first part of its own cars upon said portion of said tracks of said last named party and in so doing shall use the same character of motive power as that used by said party of the first part. And the said party of

the second part shall maintain at its own cost and expense and keep in good order and repair, any switch or switches connecting its own tracks with the said tracks of the party of the first part at the said intersection of Fourth street and Chouteau avenue. . . .

"Section Four. In case said party of the first part shall at any time in the future change the motive power on its road to a cable, then and thereafter the right of said party of the second part to use its own motive power on the tracks of the party of the first part shall cease and said party of the first part shall thenceforward haul the cars of the party of the second part by means of such new power from the said intersection of Chouteau avenue and Fourth street north to the terminus of the road of the party of the first part and return them again to said intersection of Fourth street and Chouteau avenue and after the adoption of cable power it shall be the duty of the party of the second part to deliver its cars to the party of the first part at said intersection of Fourth street and Chouteau avenue and to promptly receive them from said party of the first part at said intersection, the cost and expense of which said delivery and reception shall be paid by said party of the second part, the said delivery and reception aforesaid of the said cars of the party of the second part shall be under such reasonable rules and regulations as the party of the first part shall from time to time prescribe; provided, however, that such rules and regulations shall at all times be framed with a view to the convenient, prompt and economical operation of the cars of the respective parties of this agreement. . . .

"Section Five. In consideration of the right and privileges given and secured by this instrument to the party of the second part, the said party of the second part covenants and agrees to pay the said party of the first part the sum of twelve hundred dollars per annum, so long as the motive power used by the party of the first

part in operating its railroad shall not be changed to a cable, which said twelve hundred dollars shall be paid in four equal installments, the first of said quarterly installments to be payable in three months from the date of this instrument. But in case the motive power used by the party of the first part in operating its said railroad shall be changed to a cable, which change said party of the first part shall have the right to make, then and so soon as said party of the first part is fully prepared and able to receive and haul as hereinabove provided the cars of said party of the second part by cable power, the party of the second part shall pay to the party of the first part for such service, including the said use of the said portion of its tracks aforesaid by the cars of said party of the second part between Chouteau avenue on the south and Morgan street on the north, the sum of eighteen hundred dollars per annum, the same to be payable in equal quarterly payments."

We may state that it was provided that any failure on the part of either party to the instrument to perform its covenants promptly, would entitle the other party to terminate the agreement and all rights under it by giving the offending party ninety days' notice of its intention to do so, and was also provided that nothing in the instrument should be construed to transfer or vest in the Fourth Street Company any right of property or ownership in the tracks or motive power of the People's Company. The agreement was to continue in force until the expiration of the ordinance under which the People's Company was then operating its railway, including any extension of the duration of said ordinance, but not to extend beyond February 1, 1938. The contract stipulated that the rights, covenants, agreements and stipulations it contained, should pass to and bind the successors and assigns of the respective parties. The People's Company held its franchise from the city of St. Louis under an ordinance approved March 18, 1882, giving it

the right to construct and operate a street railway over various streets of the city, including Fourth street from its intersection with Morgan street on the north to its intersection with Chouteau avenue on the south, which strip of street is in dispute in the present action. On April 14, 1888, an ordinance was passed authorizing the People's Company to alter and extend its railway over the streets of the city and to change its motive power, so that it might thereafter operate its line of railway by cables laid underground or by electricity supplied by storage batteries carried on the cars. The Fourth Street & Arsenal Company held its franchises under an ordinance of the city of St. Louis, approved April 13, 1888, which authorized it to construct, maintain and operate a railway "to be operated by horse power or by cables laid underground, or by electricity furnished by storage batteries carried on the cars, along certain streets of the city." Section three of said ordinance empowered the Arsenal Company, with the consent of the People's Company, to use the tracks of the latter and operate cars thereon along Fourth street from Chouteau on the south to the northern terminus of the tracks of the People's Company, provided that in case the privilege was used, the Arsenal Company should not charge more than a single fare for carrying passengers over the continuous line of railway operated by it. While in the possession of such franchises as have been recited, and while engaged in the operation of their respective lines by horse power, the two street railway companies entered into the contract aforesaid; and pursuant to it the Arsenal Company operated its cars over the tracks of the People's Company from Chouteau avenue north until April 1, 1890, when the motive power of the People's Company was changed to a cable. After this change the Arsenal Company's one-horse cars were changed to two-horse cars; and these said company hauled over its tracks to Chouteau avenue on the south,

where they were hitched to the People's Company's cable cars and hauled, pursuant to the contract, by motive power furnished by the People's Company, along its Fourth street track to Morgan street and back. This hauling of the Arsenal Company's two-horse cars by the cable of the People's Company was continued from April, 1890, to the middle of the summer of 1891, when it was found that the operation of the two-horse cars was not paying the Arsenal Company and they went back to one-horse cars. These were hauled by the People's Company over its Fourth street track by means of its cable, until some time in the summer of 1892; but in the early part of that season the operation was found to be so unprofitable that only one car was hauled. We understand that these cars were operated by the Arsenal Company by horse power to the intersection of its line with the People's Company's line at Fourth and Chouteau and thence moved by the People's Company's cable over its Fourth street track. In the summer of 1892 there was a sewer explosion in the city of St. Louis which disconnected the Arsenal line from the People's line so that cars could not be transferred from one to the other, and from that time no cars of the Arsenal Company were hauled by the People's Company until 1896. A municipal ordinance was enacted April 8, 1893, authorizing the Arsenal Company to change its motive power to electricity, supplied, not from a storage battery on the car, which it was authorized to use by the original franchises granted to it, but from overhead wires; that is, to operate a trolley system over the streets of the city, a franchise not previously possessed by said company. Said ordinance further provided that the Arsenal Company, with the consent of the People's Company, might use the Fourth street tracks between Chouteau and the northern terminus of the tracks of the latter company, to operate the Arsenal Company's cars in consideration of a single fare being charged passengers over the entire

length of the latter company's line. Pursuant to this franchise the Arsenal Company erected poles and strung wires over its line and over that portion of the People's line along Fourth street from Chouteau to Morgan; but the Arsenal Company's trolley system was not put into operation until the winter of 1895 and 1896. Before beginning the operation of it, to-wit, in December, 1895, the Arsenal Company and the People's Company entered into a new agreement regarding the use of the latter company's tracks by the Arsenal Company. This contract provided, in effect, that the Arsenal Company might use the tracks of the People's Company located on Fourth street from Chouteau to Morgan and operate its cars over said track "by overhead electric system or by such other motive power" as it was then, or might thereafter, lawfully be authorized to use; provided always that the cars should be operated so as not to interfere unnecessarily with the operation of the People's Company's cars. In consideration of this easement the Arsenal Company agreed to pay the People's Company $6,000 per annum in four equal installments. It was further agreed that the arrangement should continue in force until the expiration of the ordinance under which the Arsenal Company was operating its line; but should not extend beyond March 13, 1932. At the time the first contract between the two companies was made, and perhaps when the second one was made, too, the directors and officers of the two companies and the holders of the majority, if not all, the stock, were the same individuals. That is to say, the two contracting corporations were officered and controlled by the same men. The evidence goes to show the Arsenal Company never paid any part of the rent or consideration it bound itself to pay to the People's Company for the use of the latter's tracks, under either the first or the second agreement. The two contracts were duly acknowledged and recorded and it seems that the Arsenal Company operated under

the second one until March 18, 1897, when both com-
panies passed into the hands of a receiver appointed by
the circuit court of the city of St. Louis; but the decree
turning the Arsenal Company over to a receiver was set
aside in 1898 and the property turned back to the com-
pany. The litigation between the appellant and respond-
ent and their respective claims arose in this way: on July
2, 1888, that is, a few days after the execution of the
first contract between the two companies, the Arsenal
Company executed a deed of trust to Charles Parsons
as trustee, to secure the payment of certain bonds and
coupons amounting to $50,000, payable to bearer. The
instrument covered all the property of the Arsenal Com-
pany and especially the right of said company in respect
of the use of the tracks of the People's Company on
Fourth street as given by the contract of June 25, 1888.
This deed of trust was foreclosed by the trustee Parsons,
September 20, 1898, and at the foreclosure sale John H.
Overall, now deceased, the original plaintiff in this ac-
tion, became the purchaser. He represented one John
H. Scullin in the purchase and, it seems, held the prop-
erty as trustee for the latter. In the deed of Parsons as
trustee under the deed of trust, to Overall, he conveyed
all the property of the Arsenal Company which had been
conveyed to him in trust; especially mentioning the
right of the company to use the tracks of the People's
Company on Fourth street as given by the contract of
June 25, 1888. Afterwards Overall, claiming to have
succeeded to all the rights of the Arsenal Company by
virtue of the conveyances recited, demanded the right
to run cars over the Fourth street track. This demand
was made of the respondent, the St. Louis Traction Com-
pany, which had acquired said track in the following
manner: on July 10, 1889, the People's Company exe-
cuted a mortgage on all its property, including its track,
to C. C. Maffitt, as trustee, to secure certain bonds in

127 App—18

said deed of trust described. This deed of trust was afterwards foreclosed by a suit in equity instituted in the circuit court of the city of St. Louis by the bondholders, and pending the foreclosure decree the property of the People's Company was put into the hands of a receiver by the court's order. Overall who, meanwhile, had purchased the rights and property of the Arsenal Company at the foreclosure sale made by Parsons, made demand of the receiver of the People's Company for a recognition of his rights under the contract of June 25, 1888, and also made the same demand in writing of the holders of the bonds of the People's Company who were proceeding to foreclose their security. The suit against the People's Company resulted in a decree of foreclosure November 7, 1898, and on February 9, 1899, there was a sale under the decree by C. C. Maffitt as commissioner at which August Goehner, L. M. Rumsey and Charles Parsons, as a committee representing the bondholders, were the purchasers, and a deed was duly executed by Maffitt in 1899, conveying to them all the property of the People's Company, including its Fourth street tracks. Afterwards on April 1, 1899, said purchasers by a deed, duly executed, conveyed the property to respondent, the St. Louis Traction Company, and after the Traction Company had acquired the Fourth street tracks, Overall demanded of it the right to use its tracks under the contract of June 25, 1888. As has been said, Overall represented Scullin in the purchase of the Arsenal Company's property at the sale by Parsons the trustee, and Scullin, having afterwards sold and conveyed the same to Wm. K. Kavanaugh, the latter was substituted by the court as plaintiff and appellant instead of John H. Overall, deceased. The answer of the respondent set up several defenses, such as lack of mutuality in the contract of June 25, 1888, its subsequent abandonment by the Arsenal Company and that it was illegal because the two companies had the same officers

when it was executed. But the defense with which we shall deal is, that said contract, was not intended to and did not confer on the Arsenal Company the right to operate cars by electricity over the People's line and that such a use of the line would change and increase the servitude. At the hearing in the court below the bill of the then plaintiff was dismissed, from which decree an appeal was prosecuted to this court. We transferred the case to the Supreme Court, thinking it was beyond our jurisdiction, but the Supreme Court remanded it for determination here.

GOODE, J. (after stating the facts).—From the recited facts it will be apparent that the appellant contends he has succeeded to and possesses the easement granted by the People's Company to the Arsenal Company under the contract of June 25, 1888, and deduces his title thereto through the deed of trust executed by the Arsenal Company to Charles Parsons, on July 2, 1888, and the trustee's deed of said Parsons, foreclosing the said deed of trust and dated September 20, 1898. His further contention is, as opposed to that of the respondent, that said contract is still in full force and entitles him to the relief he prays; that is, to operate cars over the Fourth street tracks now owned by the respondent. Respondent, on the contrary, insists that the first contract was not intended to and did not embrace an easement to operate cars by electricity over the Fourth street tracks; and further, that it was abrogated by the second contract of December 13, 1895, providing for the operation of cars by that force over the portions of the track in dispute. Therefore, the first thing to do is to ascertain the scope and meaning of the first contract. Mr. Overall's testimony shows that the only cars which came into his possession pursuant to the purchase of the Arsenal Company's property at the foreclosure sale, were trolley cars, and that his demand was for the operation of that

class of vehicles over the respondent's tracks. When the first contract between the Arsenal Company and the People's Company was made, the former had no franchise to use a trolley system on the streets of the city of St. Louis, but only to use horse or cable power, or electric power derived from storage batteries carried under the cars. Hence it could not have been within the contemplation of the parties or within the meaning of the contract, that the People's Company was granting to the Arsenal Company the right to use its Fourth street tracks in the operation of a trolley system. The municipal franchise to employ such a system was vested in the Arsenal Company by an ordinance of April 8, 1893, enacted nearly five years after the date of the first contract. Moreover, the barest inspection of that contract shows that no motive power was contemplated by the parties but horse power or cables. And, indeed, it looks like the only power it was intended the Arsenal Company should use in the operation of its cars over the People's Company's tracks was horse power; for it was provided that if the People's Company changed its motive power to a cable, which it was expected to do shortly, then the Arsenal Company should not itself operate cars over the People's Company's tracks, but the latter company should operate by its cable the cars of the former, and receive an increased compensation over what it was to receive when the Arsenal Company itself operated cars. That is to say, the Arsenal Company was to pay $1,200 a year while it operated its cars and $1,800 a year if the People's Company changed to cable power; for in the latter event the arrangement was that the People's Company should haul the cars of the Arsenal Company. Moreover the provision in regard to the use of the People's Company's turntable by the Arsenal Company points to the conclusion that whatever operating of cars was done by the Arsenal Company over the tracks of the other should be by horse power. The meaning of the

contract is, that the Arsenal Company acquired the right to employ horse power itself over the Fourth street tracks by paying a consideration of $1,200 a year for the privilege until the People's Company changed its motive power to a cable and the further right, after that event, to have the People's Company haul its cars (the Arsenal Company's) by cable, for a consideration of $1,800 per annum. Appellant's counsel argues that as the original franchise from the city to the People's Company of date April 13, 1888, empowered it to use either horse, cable or electric power, the parties must have contracted with the understanding that the easement embraced the right to operate cars by electricity. This argument is exploded not only by the language of the agreement as has been shown; but also by the fact that the ordinance alluded to electricity furnished by storage batteries carried under the cars and not the trolley or overhead wire system; which is an entirely different method of moving cars. Hence it is perfectly clear that the deed of trust executed to Parsons by the Arsenal Company, though it conveyed to him whatever right said company had under the contract of June 25, 1888, did not convey to him the right to operate cars by a trolley system over the Fourth street tracks; and, therefore, no such right passed by his deed to Overall for Scullin, or by assignment from Scullin to the present appellant, Kavanaugh. This interpretation is in accord with the treatment of the contract by the parties to it. It is plain that the Arsenal Company did not suppose it possessed a franchise prior to April 8, 1893, to operate a trolley system, because on that date it asked the city for and accepted a franchise empowering it to do so. It is plain, too, unless all the proceedings were colorable and fraudulent, of which there is no proof, that the officers of the Arsenal Company did not regard their first contract with the People's Company as giving them the right to use a trolley system on the Fourth street tracks, because on De-

cember 13, 1895, they took a new contract in which the right was granted. It is argued in appellant's brief that the servitude imposed on respondent's track by using the trolley cars would be less than that imposed by storage-battery cars, because the latter are heavier. This may be true or not. In any event it is immaterial. The essence of the matter is not that a greater servitude would be imposed; but that one altogether different from that granted by the original contract would be. It is not a question of greater or less servitude, but of two entirely different ones. We term the interest granted to the Arsenal Company by the People's Company under the first contract an easement, but it may be difficult to determine whether such is its nature or an irrevocable license. In either event the extent of the interest would have to be ascertained from the terms used; for each party to such a grant may insist on its being enjoyed as granted. [10 Am. and Eng. Ency. Law, p. 428; Allen v. San Jose, 92 Calif. 388; Horner v. Keene, 177 Ill. 390; Johnson v. Jaqui, 27 N. J. Eq. 552.] The owner of a dominant estate can neither increase the servitude imposed on the servient tenement or change its character. This rule is a recognition of the right of the owner of property to control its use, and is pushed to the extent of holding that although the proposed change in the character of the servitude would prove beneficial, rather than injurious, to the servient estate, it is for the owner of the latter to say whether or not he will tolerate the change. The question was well considered in Allen v. Water Co., 92 Calif. supra, wherein the defendants, as owners of the easement to carry water through an open ditch on the land of plaintiffs, preferred to lay a pipe along the bottom of the ditch and fill the latter with earth, which would be a change beneficial to the property; but the court held the proposed servitude would be a new one and not to be allowed without plaintiffs' consent, no matter whether it would be beneficial or injur-

ious. The following authorities supporting the same doctrine were cited and quoted from: Dickson v. Canal Co., 15 Beav. 260; Johnston v. Hyde, 32 N. J. Eq. 455; Gregory v. Nelson, 41 Calif. 278; Heath v. Buckneall, L. R. 8 Eq. 5. The defense that neither the appellant nor those under whom he claimed possessed the right to operate by electricity cars over the tracks on Fourth street, is so far established that a court of chancery, in the exercise of a judicial discretion, should refuse to decree that respondent is bound to permit the operation of a trolley system.

The judgment is affirmed. All concur.