Gary W. OGG and Janice
Ogg, Appellants,

v.

MEDIACOM, L.L.C., Respondent.

No. WD 63033.

Missouri Court of Appeals,
Western District.

June 22, 2004.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 27, 2004.

Application for Transfer Denied
Sept. 28, 2004.

Farrell Douglas Hockemeier, Richmond, Dale K. Irwin, Co–Counsel, Kansas City, Jonah Orlofsky, Chicago, IL, for appellants.

Jerome T. Wolf, Lee Mills Baty, Co–Counsel, Kansas City, MO, for respondent.

Before JOSEPH M. ELLIS, Chief Judge, PATRICIA BRECKENRIDGE, Judge and HAROLD L. LOWENSTEIN, Judge.

JOSEPH M. ELLIS, Chief Judge.

This is an appeal from a final order and judgment of the Circuit Court of Clay County entering summary judgment against appellants Gary and Janice Ogg ("the Oggs") and in favor of respondent Mediacom, LLC ("Mediacom") on the Oggs' civil suit against Mediacom for trespass. In that suit, the Oggs sought class action status, injunctive and equitable relief, actual and punitive damages, and an

award of attorney's fees and expenses.[1] We reverse the trial court's grant of summary judgment to Mediacom and remand for further proceedings not inconsistent with this opinion.

## Standard of Review

As stated by the Missouri Supreme Court in *Harjoe v. Herz Financial,* the standard of review governing this case, which was decided on cross-motions for summary judgment, is as follows:

When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered. Additionally the non-movant is afforded the benefit of all reasonable inferences contained in the record. Review is de novo. Because the trial court makes its decision based upon the record submitted and the law, this Court need not defer to the order of the trial court granting summary judgment. Generally, summary judgment allows a trial court to enter judgment for a party where they have demonstrated a right to a judgment as a matter of law based upon facts about which there is no genuine dispute. The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question.

108 S.W.3d 653, 654 (Mo. banc 2003) (internal citations and quotation marks omitted). "To succeed on summary judgment, a defendant must show: (1) undisputed facts negating any of plaintiffs' required elements; (2) the plaintiffs, after adequate time for discovery, cannot produce evidence sufficient to find one of plaintiffs' required elements; or (3) there is no genuine dispute as to each fact necessary to support a properly-pleaded affirmative defense." *Chouteau Auto Mart, Inc. v. First Bank of Mo.,* 55 S.W.3d 358, 360 (Mo. banc 2001) (emphasis omitted).

## Facts, Background, and Procedural History of the Case

The Oggs own, operate, and live on a family farm in an unincorporated area of Ray County, Missouri. Mediacom is a publicly-traded Delaware limited liability company which sells cable television and related services, such as broadband Internet access, to what are primarily rural municipalities throughout Missouri and over twenty other states. As of April 1, 2002, Mediacom was the nation's eighth-largest cable television company.

In January and February, 1999, a subcontractor hired by Mediacom placed approximately 933 feet of fiber optic cable on the Oggs' property.[2] Mediacom never sought permission to do this from the Oggs, nor did it obtain an easement from the Oggs or compensate them for this use of their property. The fiber optic cable was run along the edge of one of the Oggs' farm fields, about fifteen to thirty feet from the paved edge of a state public highway (Missouri State Route 10) which forms the southern boundary of the Oggs' farm. A portion of the fiber optic cable, measuring approximately 204 feet in length, was strung aerially from and connected to poles located on the Oggs' property. These poles, which were erected in

---

1. The Oggs originally filed this appeal in the Supreme Court of Missouri, contending that it had exclusive appellate jurisdiction under Article V, Section 3 of the Missouri Constitution. On July 8, 2003, our Supreme Court entered an order transferring the cause to this court.

2. Unless otherwise noted, all Missouri statutory references are to RSMo 1994 and Cum. Supp.1999, which was the law in effect at that time. However, none of the pertinent statutes have been materially amended since then. All federal statutory references are to the United States Code (2000).

1947 and support several electrical power transmission cables, are maintained and operated by Platte Clay Electric Cooperative, Inc. ("Platte Clay Electric") under a prescriptive easement it has held for decades. Mediacom hung this section of fiber optic cable from the poles approximately twelve to fourteen feet off the ground, some six feet lower than the pre-existing electrical power cables, which are at least eighteen to twenty feet above the ground. The remaining section of the fiber optic cable, which is about 729 feet long, was buried underground within the public highway right-of-way associated with Route 10.[3]

Despite the presence of this fiber optic cable on and above their property, the Oggs cannot purchase Mediacom's programming or other products. To begin with, the cable on the Oggs' property is not capable of providing service to the Oggs (or, for that matter, anyone else along the route chosen by Mediacom), as it is a fiber optic cable which transmits data via light pulses and home television sets and cable modems can generally only receive signals from a coaxial cable, which involves a different data transmission technology (radio frequency or RF). Even if the signals transmitted through the fiber optic cable were compatible with typical home television or computer components, cable television companies such as Mediacom are generally permitted to sell their programming and other services only within localities in which they have been granted a franchise by the appropriate governmental authority.[4] Two nearby towns (Richmond and Excelsior Springs) have granted Mediacom such franchises,[5] but as the Oggs live outside the boundaries of those towns, Mediacom does not sell them any programming or other services.

Mediacom ran its fiber optic cable across the Oggs' property, even though it does not and cannot sell services in that area, because of a facility consolidation program

3. There is a small amount of overlap, as 58.5 feet of the aerially-suspended cable also occupies the Route 10 right-of-way. Platte Clay Electric's right to occupy that small portion of the Route 10 right-of-way is based not on a prescriptive easement, but § 394.080.1(10), which grants rural electric cooperatives such as Platte Clay Electric the power to "construct, maintain and operate electric transmission and distribution lines along, upon, under and across all public thoroughfares, including without limitation, all roads, highways, streets, alleys, bridges and causeways, and upon, under and across all publicly held lands, subject, however, to the requirements in respect of the use of such thoroughfares and lands that are imposed by the respective authorities having jurisdiction thereof upon corporations constructing or operating electric transmission and distribution lines or systems[.]" Thus the parties' rights as to 145.5 (204 minus 58.5) feet of cable are related to the prescriptive easement, and their rights as to the remaining 787.5 (729 plus 58.5) feet of cable are related to the Route 10 right-of-way.

4. Under the federal Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521–559, Mediacom and other cable operators can sell programming and other services only to customers in areas in which they have been granted a franchise. *See 47 U.S.C. § 541(b)(1)* ("[A] cable operator may not provide cable service without a franchise.") A franchise is a statute or ordinance that specifically authorizes a company such as Mediacom to sell cable programming or other services to the residents of a particular area. In Missouri and virtually every other state, cable company franchises are awarded by the municipal governments of cities, towns, and villages.

5. The franchise-granting ordinances of these two towns, which are contained in the record, are typical in that they not only grant Mediacom the right to sell programming and other services, but also contain regulations to ensure that it operates in the interest of local citizens. Thus, while cable operators like Mediacom are regulated entities, they are generally regulated by the federal government and the local governments of the communities they have been franchised to serve.

Mediacom instituted to lower its costs. Cable television operations require a "headend," a costly facility with an antenna, satellite dish, or some other signal-receiving device to gather data. From the headend, cable lines flow out to the homes in the franchise area served by the cable provider. As of December 31, 2000, Mediacom had 409 independent headend facilities located across the country.

Several years ago, Mediacom decided that it could lower its capital costs by eliminating many of its headend facilities through a fiber optic cable system. If a fiber optic cable is run from one headend to another, one of the two headends can be eliminated. One headend would continue to receive a signal via satellite dish, antenna, or some other device, but the other headend would no longer need a functioning signal-receiving device because it would get its signal from the remaining headend via the fiber optic cable. The fiber optic cable line linking two headend facilities in this manner is known as an "interconnect cable." It provides no programming or related services to any consumer, and its sole purpose is to enable the elimination of headends so that Mediacom can lower its fixed capital costs on a per-home basis. As described in its 2001 Annual Report to its shareholders:

> We believe that fiber optics and advanced transmission technologies make it cost effective to consolidate our headend facilities, allowing us to realize operating efficiencies and resulting in lower fixed capital costs on a per home basis as we introduce new products and services.

Mediacom's headend consolidation plan required running a planned 10,000 miles of interconnect cables. By December 31, 2001, Mediacom had run over 3,000 miles of such cables, and thereby lowered the number of headends from 409 to 273. Mediacom planned to use more than 5,500 miles of additional interconnect cables to eliminate another 190 headends by June 2003, which would leave only 83 headends.

It is this headend consolidation process that led Mediacom to run an interconnect cable on the Oggs' property. Mediacom originally had headends in both Excelsior Springs and Richmond, and it sought to connect these two facilities and eliminate the Richmond headend. The Oggs' property lies along the route Mediacom selected for the Excelsior Springs to Richmond interconnect cable.

The Excelsior Springs to Richmond interconnect cable has been completed. The Excelsior Springs headend now services both Excelsior Springs and Richmond, and Mediacom no longer operates a headend facility in Richmond. The sole function of this interconnect cable is to connect two Mediacom facilities, thus lowering Mediacom's cost of doing business. While the Richmond–Excelsior Springs interconnect line runs across the property of numerous people, including that owned by the Oggs, none of the property owners who live outside those towns can or will be allowed to use Mediacom's services because they live outside of Mediacom's franchise areas. This interconnect cable has, therefore, been installed solely for the benefit of Mediacom and its shareholders, without providing any benefit whatsoever to the owners of the rural real estate on which it has been placed.

The Oggs brought suit against Mediacom for trespass. They subsequently filed a motion for partial summary judgment on the issue of Mediacom's liability, reserving the issue of damages for a trial. Mediacom cross-moved for summary judgment, seeking dismissal of the Oggs' case in its

entirety.[6] The trial court denied the Oggs' motion and granted Mediacom's motion, leading to this appeal.

## Analysis

### I.

 "Trespass is the unauthorized entry by a person upon the land of another, regardless of the degree of force used, even if no damage is done, or the injury is slight." *Crook v. Sheehan Enters., Inc.,* 740 S.W.2d 333, 335 (Mo.App. E.D.1987); *see also Kitterman v. Simrall,* 924 S.W.2d 872, 878 (Mo.App. W.D.1996) (noting that liability for trespass "exists whether or not done in good faith and with reasonable care, in ignorance, or under mistake of law or fact"). While a particular trespass may constitute what seems to be only a minor inconvenience, a property owner's right to exclude others from his or her land has been recognized as " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 433, 102 S.Ct. 3164, 3174–75, 73 L.Ed.2d 868 (1982) (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979)). For this reason, in Missouri, the malicious or willful failure to observe such property rights can result in common law liability for punitive damages, even when the user claims a prescriptive right of use, where the use is in reckless disregard of or indifference to the rights of a property owner. *See, e.g., Tamko Asphalt v. Arch Assocs.,* 830 S.W.2d 434, 441–42 (Mo.App. E.D.1992); *Maryland Heights Leasing, Inc. v. Mallinckrodt, Inc.,* 706 S.W.2d 218, 226 (Mo.App. E.D.1985). Mediacom does not deny that if it needed to obtain the Oggs' permission or authoriza-tion to place the interconnect cable on their property, its agents committed a trespass. Instead, Mediacom contends that it did not need the Oggs' authorization to enter and use their land since it secured, by way of written licenses from the Missouri State Highways and Transportation Commission ("the Commission") and Platte Clay Electric, the right to use the pre-existing highway right-of-way and prescriptive easement held by them, respectively. The Oggs contend that the language of the instruments involved was ineffective to grant such rights, and furthermore, even if the instruments were properly worded, neither the Commission nor Platte Clay Electric had the legal authority to confer them on Mediacom.

The Oggs present four points relied on. In the first, they argue that the trial court erred in granting Mediacom's motion for summary judgment because its legal conclusion that Mediacom had the lawful authority to occupy (*i.e.,* bury the underground portion of its interconnect cable along) the Route 10 right-of-way by virtue of a license granted by the Commission was incorrect, in that the Commission lacked the statutory or constitutional authority to grant a valid license to a cable company such as Mediacom. In their second point, the Oggs contend the trial court erred in entering summary judgment for Mediacom because even if the Commission had the licensing authority referred to in its first point relied on, it never granted Mediacom such a license in that the permit issued to Mediacom by the Commission did not give Mediacom permission to bury the interconnect cable within the Route 10 right-of-way, but only allowed excavation on the Route 10 right-of-way for a limited

6. The Oggs' motion for class certification was pending at the time of the cross-motions for summary judgment. At the request of Mediacom, and by agreement with the trial court, a ruling on the class certification motion was deferred until after the summary judgment motions were resolved.

period of time. Next, the Oggs claim the trial court erred in granting Mediacom's motion for summary judgment because its legal conclusion that Mediacom had the right to run the above-ground portion of its interconnect cable along the electrical power poles by virtue of a license granted by Platte Clay Electric to Mediacom for use of Platte Clay Electric's prescriptive easement was incorrect, in that the license was merely a pole attachment agreement which expressly provided that Mediacom had to obtain its own easement. And, in their fourth and final point, the Oggs assert the trial court erred in entering summary judgment for Mediacom because even if Platte Clay Electric had granted the license referred to in its third point relied on, it would be unlawful in that it would create a right beyond the scope of the original easement and would create an unreasonable additional burden on the property.

## II.

We begin with the Oggs' fourth point relied on, which, for all practical purposes, also disposes of their third point.[7] The trial court held that Mediacom's lawful right to use Platte Clay Electric's pre-existing prescriptive easement by license from Platte Clay Electric without either compensating the Oggs or privately obtaining an easement therefrom "turns entirely on whether the addition of Mediacom's cable to utility poles already containing an electric wire imposes an additional unreasonable burden." As noted by the Oggs in their brief, that is a materially incomplete declaration of the law of Missouri. Indeed, as we now explain, the trial court erred in focusing exclusively on the extent to which the purported license from Platte Clay Electric conferred a right of use in Mediacom which would create an unreasonable additional burden or servitude upon the Oggs' title.

While "the owner of an easement may, in some circumstances, license or authorize third persons to use its right of way,"[8] the licensor "may not create a right in excess of [that] held by it, nor ... a right which as against the owner of the servient estate is an additional burden or servitude upon the fee simple title." *Eureka Real Estate & Inv. Co. v. S. Real Estate & Fin. Co.*, 355 Mo. 1199, 200 S.W.2d 328, 332 (1947).[9] Therefore, the

7. This is not to say that the Oggs' third point relied on necessarily lacks merit. *See, e.g., Mobile Home Assocs. v. Cablevision of Jefferson County*, 697 S.W.2d 215, 216 (Mo.App. E.D.1985); *Krohn v. Marcus Cable Assocs., L.P.*, 43 S.W.3d 577, 583 (Tex.App.2001), *aff'd on other grounds*, 90 S.W.3d 697 (Tex.2002). We simply need not address it because of our disposition of the Oggs' other points.

8. We need not decide whether the prescriptive easement held by Platte Clay Electric was capable of being apportioned (i.e., licensed to a third party) inasmuch as the Oggs do not dispute the issue and in light of our ultimate disposition of the appeal.

9. Mediacom argues that the Oggs are precluded from advancing this argument on appeal since it did not specifically raise it at the circuit court level. We disagree. To begin with, the record confirms that the Oggs did indeed bring the *Eureka* case to the circuit court's attention in its written submissions, citing it to support its rather extensive argument that the licensing agreement between Platte Clay Electric and Mediacom was invalid. Even if the circuit court was not presumed to know the law (which it is, *Harrison v. Coomber Realty & Inv. Co.*, 359 Mo. 862, 224 S.W.2d 63, 64 (1949)), this was more than sufficient to put the court on notice of all of that case's applicable holdings, including those now more explicitly and completely developed by the Oggs in this appeal. At worst, the Oggs have simply focused on language in *Eureka* that they did not focus on before. This is not the type of "new argument" that is prohibited on appeal. Moreover, Mediacom's argument is based on a fundamental misconception of the summary judgment process. It

licensing agreement between Platte Clay Electric and Mediacom could, at most, lawfully confer on Mediacom *only* the rights Platte Clay Electric itself held under its prescriptive easement.[10] "One can commit the tort of trespass either by unauthorized entry on land or by exceeding the scope of any license to enter upon the land." *Cochran v. Burger King Corp.*, 937 S.W.2d 358, 362 (Mo.App. W.D.1996). Likewise, if the user of an easement exceeds his or her usage rights in either manner or extent, the user becomes a trespasser to the extent of the unauthorized use. *Branson West, Inc. v. City of Branson*, 980 S.W.2d 604, 606 (Mo.App. S.D.1998).

■ Since "courts hesitate to infringe upon rights normally incident to the absolute ownership of land," *George v. Dickinson*, 504 S.W.2d 658, 663 (Mo.App. E.D. 1974), prescriptive easements "are no favorites of the law." *Cook v. Bolin*, 296 S.W.2d 181, 187 (Mo.App. S.D.1956). Accordingly, "[e]ach claim to a prescriptive easement must be determined on its own peculiar facts, and if there is doubt as to the character of use or intention of the parties it must be resolved in favor of the free and untrammeled use of the land" by the owner of the fee. *Id.*

■ In Missouri, the rights of the holder of an easement acquired by prescription are defined solely by the character and extent of the use made thereof during the prescriptive period.[11] *Stickle v. Link*, 511 S.W.2d 848, 854 (Mo.1974). That is to say, when an easement is acquired by prescription, the rights of the holder are "fixed and determined by the use under which it is gained.... Under prescription an exclusive right of possession can not be established but only a qualified right for a particular purpose." *Riggs v. City of Springfield*, 344 Mo. 420, 126 S.W.2d 1144, 1149 (1939). "[Prescriptive] easements arise by reason of use. It is rational that an easement that exists because of use, which falls short of posses-

---

was Mediacom's burden to demonstrate its undisputed right to judgment as a matter of law. *Hayes v. Hatfield*, 758 S.W.2d 470, 472 (Mo.App. W.D.1988). In this court, it is the Oggs' burden, as appellants, to show that the circuit court erred when deciding that pure issue of law in favor of Mediacom—a determination we review *de novo*. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). In addition, to accept Mediacom's total preclusion argument would require us to affirm a grant of summary judgment on appeal in *every* case where the non-moving party did not file a response at the circuit court level. That is not the law of this state, as any party against whom summary judgment has been entered is entitled, even for the first time on appeal, to challenge the circuit court's underlying legal conclusion that the moving party was entitled, on the record submitted and the law, to judgment as a matter of law. *See id.* at 380 (citing *E.O. Dorsch Elec. Co. v. Plaza Constr. Co.*, 413 S.W.2d 167, 173 (Mo.1967) and *Cure v. City of Jefferson*, 380 S.W.2d 305, 309–10 (Mo.1964)).

10. The language of the licensing agreement illustrates that Mediacom was (or should have been) acutely aware of this limitation. For example, the agreement states that in exchange for a fee of $14.00 per year per jointly used pole, Platte Clay Electric was "willing to permit Licensee, *to the extent it may lawfully do so*, to place said lines, attachments, and apparatus on [the] poles" owned, operated, and maintained by Platte Clay Electric. The agreement further states: *"The Licensor does not warrant or assure to the Licensee any right-of-way privilege or easements*, and if the Licensee shall at any time be prevented from placing or maintaining its attachments on the licensor's poles, no liability shall attach to the Licensor. *Each party shall be responsible for obtaining its own easements and right-of-way."* (Emphasis added.) We further note that such pole attachment agreements are, under certain conditions we need not discuss here, subject to regulation by the FCC. *See 47 U.S.C. § 224.*

11. The period of prescription in Missouri is ten years. *§ 516.110.*

sion, may not be extended in its character and extent beyond the use which existed when the prescription arose." 18 THEODORE H. HELLMUTH, *MISSOURI PRACTICE: REAL ESTATE LAW—TRANSACTIONS* § 420, at 430 (2d ed.1998).[12] For this reason, the holder of a prescriptive easement has only the qualified and limited nonpossessory right to use the servient estate for a particular purpose, and "no different or greater use can be made of [it] than the use under which it was gained." *Lacy v. Schmitz*, 639 S.W.2d 96, 100 (Mo.App. E.D. 1982). "Thus, the owner of a servient estate can prohibit any significantly increased use" of a prescriptive easement by the owner of the dominant estate. Hellmuth, *supra*, at 429.

 Applying this well-developed body of law to the undisputed material facts, it is readily apparent that Mediacom exceeded the scope of any license Platte Clay Electric could lawfully have granted Mediacom. The qualified and limited nonpossessory rights held by Platte Clay Electric under its prescriptive easement were fixed and determined by the particular use it made of the affected portion of the Oggs' property during the prescriptive period, which was to operate and maintain electrical power cables on poles at a height of approximately eighteen to twenty feet. Absent their permission, or the running of another 10–year prescriptive period, no different or greater use could lawfully be made of that portion of the Oggs' property by Platte Clay Electric or Mediacom, neither of whom had the legal right to unilaterally expand, in character or extent, the

prior prescriptive use—yet that is precisely what Mediacom attempted to do. *Accord Stickle*, 511 S.W.2d at 855–56; *Cheatham v. Melton*, 593 S.W.2d 900, 903–04 (Mo.App. E.D.1980); *U.S. v. 43.12 Acres of Land*, 554 F.Supp. 1039, 1043 (W.D.Mo. 1983). Point granted.[13]

### III.

Before addressing the Oggs' two remaining points, both of which concern the underground portion of the interconnect cable, we note that in several of its various submissions to the circuit court and in its brief here, Mediacom argued that most (to be precise, 393.9 feet) of that 729–foot section of the cable is buried within a strip of land in which the Oggs have no property interest whatsoever, because the land was conveyed by their predecessors in title to the State of Missouri in fee simple absolute in 1924. That claim was disputed by the Oggs, both before the circuit court and in their brief here, who argued that the deed contains various language limiting the interest conveyed to an easement for the specific purposes of construction and maintenance of a state highway (namely, Route 10). Although this is clearly a question of law, the circuit court did not decide the issue one way or the other, evidently at the urging of one or both of the parties. Moreover, Mediacom's brief makes it plain that it is content to agree or "assume," for the purposes of summary judgment and this appeal, that the 1924 deed confers only an easement and, therefore, that the entire underground run of Mediacom's in-

---

**12.** "[A]n easement, strictly speaking, does not carry any title to the land over which it is exercised; it is rather a right to use the land for particular purposes. Logically this would be especially true where the easement is in fact claimed by prescription or user and not by grant." *Smith v. Santarelli,* 355 Mo. 1047, 199 S.W.2d 411, 412 (1947).

**13.** As noted *supra,* to the extent the purported license from Platte Clay Electric conferred a right of use in Mediacom placing an unreasonable additional burden or servitude upon the Oggs' fee simple title, it was also unlawful under the second prong of *Eureka. See, e.g., Kavanaugh v. St. Louis Traction Co.,* 127 Mo. App. 265, 105 S.W. 278, 282 (1907).

terconnect cable lies within the public highway right-of-way associated with Route 10. However, in the interest of judicial economy, and since the issue is not only ripe for determination but also essential to the proper disposition of this case on remand, we will address it.

The deed relied upon by Mediacom is specifically and prominently denominated, at the top of its first page, as a "RIGHT OF WAY DEED," and recites that it is an indenture by and between Georgia Bruns (the Oggs' predecessor in title) and the State of Missouri, executed on July 31, 1924. It further recites that Miss Bruns, in consideration of her receipt of the sum of $1.00 from the State, "does by these presents REMISE, RELEASE and forever QUITCLAIM unto" the State "the following described land...." A full legal description of the land conveyed, which is expressly referred to as a "strip of land 30 feet in width [and] 1897.8 feet in length," is then set forth, including a recitation that the "Southerly boundary of said strip of land" is "the center line of the proposed State highway, designated 'Route No. 10,' as heretofore surveyed and established by the Missouri State Highway Commission." The deed's habendum clause is as follows: "TO HAVE AND TO HOLD the same, with all the rights, immunities, privileges and appurtenances thereto belonging to the [State], for the purposes of construction and maintenance of a State Highway on the said land herein conveyed, FOREVER." The certificate of record on the reverse side states that the instrument, which is further denominated in writing as a "RIGHT OF WAY DEED From Georgia A. Bruns to STATE OF MISSOURI," was duly recorded on August 18, 1925.

The question is whether the grantor intended to convey the land at issue in fee simple absolute, as claimed by Mediacom, or whether she intended to grant only an easement for state highway right-of-way purposes, as claimed by the Oggs.

> According to [the] well-established rule, a deed is to be construed as nearly as possible in harmony with the purpose of the grantor, to be determined from the terms of the instrument. It is the primary rule of construction of contracts, deeds and wills that they must be construed as a whole, giving effect to every part if it is fairly possible to do so, and thus determine the true intention of the parties. Accordingly, the intention of the grantor, as gathered from the four corners of the instrument, is now the pole star of construction. That intention may be expressed anywhere in the instrument, and in any words, the simpler and plainer the better, that will impart it; and the court will enforce it no matter in what part of the instrument it is found.

*Hess v. Proffer*, 87 S.W.3d 432, 435 (Mo. App. S.D.2002) (internal citations, quotation marks, and brackets omitted). Considering the deed as a whole, with all of its terms and provisions, and giving effect to all, so far as possible, we think that the deed clearly manifests the intent to convey only an easement.

> Use of terms such as 'right of way,' 'road,' or 'roadway' as a limitation on the use of land is a strong, almost conclusive, indication that the interest conveyed is an easement. This doctrine arises from a recognition that from a practical standpoint long narrow strips of land serve little or no function other than for roads or rights of way. Therefore, unless the parties make it clear that a fee is intended, it is presumed that they did not intend to create an otherwise unusable interest in land.

*Hartman v. J & A Dev. Co.*, 672 S.W.2d 364, 365 (Mo.App. E.D.1984) (internal cita-

tions omitted). Here, there are no clear, overriding indicia of an intent to convey full fee ownership of the land in question. To the contrary, the deed, which involves a long, narrow strip of land and is expressly denominated in two different places as a "right of way deed," contains other language tending to limit the quantum of the interest conveyed, including a description of the land's intended relationship to Route 10 and a statement that the grant was "for the purposes of construction and maintenance of a State Highway." Furthermore, the recited consideration was nominal ($1.00), which is "not a sum that would suggest purchase of a fee simple interest" in the strip. *City of Columbia v. Baurichter,* 729 S.W.2d 475, 480 (Mo.App. W.D.1987). These are all strong, if not conclusive, indications that the grantor intended to part with less than the fee. *See Jordan v. Stallings,* 911 S.W.2d 653, 657–58 (Mo.App. S.D.1995) (collecting cases and holding that even though some of the words used in the deed being interpreted were consistent with a warranty deed or a conveyance of fee simple, that "does not change the fact that the interest conveyed was that of a right of way which results in the conveyance of an easement only.") We therefore hold that the deed provided the State of Missouri with a permanent easement over a narrow strip of what is now the Oggs' land for state highway (Route 10) right-of-way purposes—nothing more. Accordingly, the entire underground run of Mediacom's interconnect cable lies within the public highway right-of-way associated with Route 10, and Mediacom's liability for trespass with regard to that length of cable turns on whether it had the legal right to occupy that right-of-way.

## IV.

We now proceed to the Oggs' second point relied on, in which they contend that the trial court erred in entering summary judgment for Mediacom because the Commission never gave Mediacom permission to bury the interconnect cable within the Route 10 right-of-way in that the permit issued to Mediacom by the Commission only allowed excavation on the Route 10 right-of-way for a limited period of time. Based on selected quotations from the permit itself, the Oggs claim that it gave Mediacom only a temporary license to be on the right-of-way for at most a three-month period, and that the permit provided only the right of ingress and egress to the right-of-way, not the right to bury the fiber optic interconnect cable within the right-of-way. We disagree. As noted by Mediacom, the Oggs' argument ignores the fact that the permit specifically incorporates by reference the associated permit application, which clearly provides Mediacom permission to perform "[e]xcavation" on and bury cable within the Route 10 "utility corridor." In particular, the permit states that "All work covered under this permit is to be in accordance with the attached permit application," and the permit application states that the work Mediacom was authorized by the Commission to perform was to "Bury 36" deep interduct and fiber 825' along State highway 10. This installation to be within the 6 ft. utility corridor." The language of the permit application, which was incorporated into the permit by reference and was, therefore, as much a part of the permit as if it had been set out in the permit *in haec verba* (see *Dunn Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 435 n. 5 (Mo. banc 2003)), makes it obvious that the Commission did, in fact, give Mediacom the permission the Oggs claim was never given. Point denied.

## V.

Of course, whether the Commission had the legal authority to grant such permission to Mediacom is an entirely different

question—which brings us to the Oggs' first (and final) point relied on, in which they claim the trial court erred in granting Mediacom's motion for summary judgment because its legal conclusion that Mediacom had the lawful authority to occupy (*i.e.*, bury the underground portion of its interconnect cable along) the Route 10 right-of-way by virtue of a license granted by the Commission was incorrect, in that the Commission lacked the statutory or constitutional authority to grant a valid license to a cable company such as Mediacom. This is an issue of first impression in this state. Neither party has cited any Missouri authority specifically governing the question, and our own research was equally unavailing. However, we decline to accept Mediacom's open invitation to apply case law (and, in many instances, statutes) from other states, since existing Missouri precedent permits us to properly address this point.

Under Missouri's Public Service Commission Law,[14] public utilities, such as tele-phone, telegraph, electric, gas, water, and sewer companies, are regulated by the Missouri Public Service Commission on a statewide basis.[15] The General Assembly has, by statute, expressly granted these public utilities the privilege to use state highway rights-of-way free of charge. *See, e.g.,* § 392.080 (telecommunications companies); §§ 393.010 and 393.020 (electric, gas, and water companies); § 393.025.2 (sewer companies); and § 394.080.1(10) (rural electric cooperatives).[16] Moreover, the General Assembly has also expressly given public utilities the power to acquire, via eminent domain after conducting appropriate condemnation proceedings, the privately-owned lands they may need to provide their services to the citizens of Missouri. *See, e.g.,* § 392.100 (telecommunications companies); §§ 393.020 and 393.030.1 (water companies); § 523.010 (electric and gas companies); § 393.025.1 (sewer companies); and § 394.080.1(11) (rural electric cooperatives).[17]

---

**14.** The Public Service Commission Law "includes all of Chapter 386, sections 387.010 to 387.340, 389.640, 389.780, 390.020 to 390.170, 391.070, 392.190 to 392.360 and 393.110 to 393.290." *§ 386.010 & Revisor's note 1.*

**15.** *See, e.g.,* § 386.020(42), which states: " 'Public utility' includes every pipeline corporation, gas corporation, electrical corporation, telecommunications company, water corporation, heat or refrigerating corporation, and sewer corporation, as these terms are defined in this section, and each thereof is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of this chapter[.]"

**16.** We note that these statutes are founded "upon the theory that the public benefit to be derived from the promotion of the services rendered by public utilities warrants granting to them of the privilege of placing their lines upon the highways[.]" *State ex rel. State Highway Comm'n v. Union Elec. Co.,*

142 S.W.2d 1099, 1102 (Mo.App. E.D.1940); *see also State ex inf. McKittrick v. Southwestern Bell Tel. Co.,* 338 Mo. 617, 92 S.W.2d 612, 614 (1936). Mediacom urges us to hold that because it arguably provides a similar public benefit to those in its franchised areas, it should be deemed, as a matter of law, to possess the implied privilege to use highway rights-of-way throughout the entire state, even in the absence of an express legislative grant of such a privilege. We decline Mediacom's invitation, as such a determination is more appropriately made by the legislature.

**17.** As our Supreme Court pointed out in *State ex rel. Wagner v. St. Louis County Port Auth.,* 604 S.W.2d 592 (Mo. banc 1980), this is a very significant grant of power. " '[T]he legislature may exercise the power of eminent domain or may authorize its exercise by others[,] and the legislature has like authority to determine what, if any, regulations should be enacted to control exercise of such power when delegated. The necessity, expediency, and propriety of exercising the power of eminent domain are questions essentially legisla-

In stark contrast, the definition of "public utility" in § 386.020(42) makes it clear that cable television companies such as Mediacom are *not* public utilities within the regulatory purview of the Public Service Commission.[18] Likewise, the legislature has not seen fit to authorize cable companies to use state public highway rights-of-way throughout Missouri, and cable companies have not received a legislative grant of authority from the General Assembly to exercise the power of eminent domain, either. Based on these statutes (or the lack thereof), the Oggs argue that the Commission can neither grant nor deny any public utility the statutory privilege of using a state highway right-of-way, but can only determine where on the right-of-way a public utility with a pre-existing privilege to be there should locate its fixtures so as not to interfere with highway purposes. On the other hand, Mediacom argues that the Commission's authority to issue Mediacom a valid license to use the Route 10 right-of-way need not "be found in a specific statutory grant—the power may be, and in this case, is, implied." We agree with the Oggs. The underlying question is whether the Commission can unilaterally grant to a cable television company, by permit, license, or in any other manner, the privilege to use state highway rights-of-way free of charge in the absence of any legislative authorization. The answer to that question is no.

To illustrate the proper operation of the statutory scheme discussed above in the context of the Commission's permit system, we consider § 392.080, which is typical of the various statutes granting public utilities the privilege to use state highway rights-of-way. It provides that telecommunications companies organized under the provisions of sections 392.010 to 392.170 are, "for the purpose of constructing and maintaining telephone or magnetic telegraph lines," expressly "authorized to set their poles, piers, abutments, wires, and other fixtures along, across or under any of the public roads, streets and waters of this state, in such manner as not to incommode the public in the use of such roads, streets and waters[.]" Meanwhile, § 227.240.1 gives the Commission the power to control and supervise a public utility's use of the right-of-way under § 392.080 and similar statutes:

The location and removal of all telephone, telegraph and electric light and power transmission lines, poles, wires, and conduits and all pipelines and tramways, erected or constructed, or hereafter to be erected or constructed by any corporation, association or persons, within the right-of-way of any state highway, insofar as the public travel and traffic is concerned, and insofar as the same may interfere with the construction or maintenance of any such highway, shall be under the control and su-

tive (or, as is sometimes said, political), and not judicial, in nature, and a grant of the power by the General Assembly carries with it the right to determine [those] essentially legislative (or political) questions.'" *Id.* at 599 (quoting *State ex rel. Coffman v. Crain,* 308 S.W.2d 451, 455 (Mo.App. S.D.1958)) (internal citations and emphasis omitted).

**18.** In fact, the General Assembly has specifically *excluded* such companies from the regulatory jurisdiction of the Public Service Com-

mission. *See § 386.020(53)* (which defines "[t]elecommunications service" as that term is used in the Public Service Commission Law as "the transmission of information by wire, radio, optical cable, electronic impulses, or other similar means") and *§ 386.020(53)(f)* (stating that "[c]able television service" does not constitute "telecommunications service"). *Cf. 47 U.S.C. § 541(c)* ("Any cable system shall not be subject to regulation as a common carrier or utility by reason of providing any cable service.")

pervision of the state highways and transportation commission.

Thus, in issuing permits governing the placement of such fixtures within a state highway right-of-way, the Commission is simply carrying out its statutory duty of "control and supervision" to ensure that a public utility's fixtures are not placed by the utility in such a manner as to interfere with the construction or maintenance of the highway or to incommode the public in its use for travel and traffic. *See Franke v. Southwestern Bell Tel. Co.,* 479 S.W.2d 472, 476 (Mo.1972); *State ex rel. State Highway Comm'n v. Weinstein,* 322 S.W.2d 778, 783 (Mo. banc 1959).

 It is also important to keep in mind that the Commission's power to regulate the use of state highway rights-of-way by public utilities is limited. While the Commission can issue permits governing the proposed location of a public utility's fixtures within such rights-of-way to ensure that the location requested will not incommode the public use of the roadway, and may also supervise the construction and maintenance of the fixtures in the event it decides to issue such a permit, that is the full extent of the Commission's power in such matters. As our Supreme Court explained in the *Weinstein* case:

> Although the Commission is given authority [by § 227.240] to designate the location of pipe lines and to require relocation [if necessary], it has no right to exclude them from the right of way.... [T]he effect of this statute 'is to place the matter of the location of the lines and appurtenances of public utilities under the control and supervision of the commission, not, however, for any and all manner of regulation which may perchance seem expedient to the commission, but only in so far as the location of such lines and appurtenances may affect the construction, maintenance, and ordinary use of the highways'; and that 'the

only orders which the commission may lawfully enter under [§ 227.240] are those which are designed to prevent interference with traffic on the highways and with highway construction and maintenance.'

*Weinstein,* 322 S.W.2d at 782–83 (quoting *Union Electric,* 142 S.W.2d at 1101). Moreover, as the Eastern District further explained in *Union Electric:*

> That [§ 227.240] was not intended as a grant to the commission of unlimited control and supervision over the right of a public utility to place its lines upon public highways and bridges is exemplified by the fact that the exercise of such right is in nowise dependent upon permission obtained by the commission. On the contrary, it is only the matter of the location and relocation of the lines with a view to public travel and traffic and the construction and maintenance of the highways over which the commission has control; and indeed the very section which confers such power expressly denies to the commission the right to exclude the lines and appurtenances of public utilities from the highways.... [T]he commission ... must therefore be held to lack the right to [regulate] ... the exercise of a privilege which it has neither the power to grant or to prevent.

*Union Electric,* 142 S.W.2d at 1101–02; *see also State ex rel. State Highway Comm'n v. Kansas City Power & Light,* 232 Mo.App. 308, 105 S.W.2d 1085, 1087–88 (1937).

The Commission is vested only with such powers as are specifically conferred upon it by the constitution and statutes, as well as those implied powers which are necessary or proper to enable it to carry out fully and effectively the purposes of those constitutional and statutory provisions. *State ex rel. State Highway Comm'n v. City of St. Louis,* 575 S.W.2d 712, 720 (Mo.App. E.D.1978); *State ex rel.*

*State Highway Comm'n v. Camden County*, 394 S.W.2d 71, 76–77 (Mo.App. S.D. 1965). That is to say, whether the Commission has a particular implied power "depends upon whether such a power is 'necessary to the just and reasonable execution of the power expressly conferred[.]' " *City of St. Louis*, 575 S.W.2d at 720 (quoting *Union Electric*, 142 S.W.2d at 1101). Accordingly, it has been held that "orders relating to a utility's use of a bridge or highway for its lines which are not essential to the full and effective performance of such specific function of the commission are consequently not within the scope of the power impliedly conferred upon it." *Union Electric*, 142 S.W.2d at 1101. Under this standard, and as illustrated by the cases we have cited and discussed, the Commission has no implied power to decide whether Mediacom has or should have the privilege to use state highway rights-of-way because neither the Missouri Constitution nor the Missouri statutes assign the Commission any function that requires implying such a power. In short, we hold that there is simply no basis, in law or in fact, for implying the power Mediacom claims is held by the Commission.[19]

**VI.**

Mediacom's final argument in support of the circuit court's ruling is that the Commission had the power to issue Mediacom a valid license to occupy the Route 10 right-of-way under an *express* legislative grant of authority. Mediacom reaches this conclusion, as did the circuit court, by seizing on certain language contained in §§ 67.1830–67.1846, RSMo Supp.2002,[20] which includes "every cable television service provider" within the definition of "public utility" as that term is used within those statutes. *§ 67.1830(9).* Based on this, Mediacom claims it is "on a par" with the public utilities regulated by the Public Service Commission, and as such, is equally deserving of the state highway right-of-way access they enjoy. We disagree.

 We need not undertake the task of construing the rather involved and fairly complex statutes upon which Mediacom relies in any detail, as it is abundantly clear they have no bearing whatsoever on this case. To begin with, they did not even take effect until July 12, 2001—nearly two and a half years after Mediacom's alleged trespasses on the Oggs' land occurred, and several months after the Oggs

19. Although not mentioned by either party in their briefs, we observe that effective May 30, 2003, the Commission amended the prior (February 28, 1998) version of one of its regulations (7 CSR 10–3.010, titled "Location and Relocation of Utility Facilities on State Highways") by adding a subsection defining "cable television" as a "utility" within the meaning of the regulation. *See 7 CSR 10–3.010(3)(I).* While a cable television company might be, under some limited set of hypothetical circumstances, a public utility for the Commission's regulatory purposes, under the factual circumstances of this case it is not, and to the extent the regulation purports to suggest otherwise, it is invalid and not to be followed by the Commission.

20. Speaking very generally, these statutes allow certain municipal and county governments to require permits for the use of local public rights-of-way by public utilities, and gives them the authority to revoke or refuse to grant such permits under certain circumstances. They are also given the express right to manage the locally-owned and controlled public rights-of-way within their territorial limits, and to recover the management costs from the public utility, which may pass on those costs to the consumer. Public utility right-of-way users are further required to restore the local public right-of-way and surrounding areas after excavation. *See also XO Missouri, Inc. v. City of Maryland Heights*, 256 F.Supp.2d 976, 980–81 (E.D.Mo.2003) (setting forth and discussing other specific provisions of §§ 67.1830–67.1846), *aff'd*, 362 F.3d 1023 (8th Cir.2004).

filed this lawsuit. *See* 2001 Mo. Laws 1313, 1320. Furthermore, they apply only to the actions of a "political subdivision" vis-à-vis a "public utility right-of-way user." "Political subdivision" is defined in § 67.1830(7) to mean "a city, town, village, county of the first classification or county of the second classification[.]" "Public utility right-of-way user" is defined as "a public utility owning or controlling a facility in the public right-of-way," § 67.1830(10), while "public right-of-way" is defined in § 67.1830(8) to mean "the area on, below, or above a public roadway, highway, street or alleyway in which the political subdivision has an ownership interest," subject to certain exclusions. However, as the factual summary provided earlier in this opinion demonstrates, none of the events giving rise to this litigation involved a "political subdivision" as defined in § 67.1830(7), a "public right-of-way" as defined in § 67.1830(8), or a "public utility right-of-way user" as defined in § 67.1830(10), since no Missouri city, town, village, or county government ever took *any* action, official or unofficial, regarding the portion of the Route 10 right-of-way at issue here, which is owned and controlled by the State of Missouri, not Ray County or any municipal government.[21] Sections 67.1830–67.1846 are, therefore, totally inapplicable to this case.

Moreover, §§ 67.1830–67.1846 are entirely consistent with the local cable company franchise ordinances of Richmond and Excelsior Springs, both of which are contained in the record and specifically authorized Mediacom to use the local public rights-of-way located within those municipalities. This localized control and grant of permission to use rights-of-way within the particular communities being served is consistent with, and indeed required by, the overarching federal regulatory scheme for cable television service. *See 47 U.S.C. § 541(a)(2)*, which provides, in relevant part: "Any franchise ordinance shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be serviced by the cable system. . . ."

Finally, the Richmond franchise ordinance (like that of Excelsior Springs) also subjects Mediacom to extensive local regulation over such things as customer service standards, fire and electrical safety requirements, and repair and restoration of the local public rights-of-way and surrounding areas after excavation or maintenance at no cost to the city, not to mention many other desirable features. In essence, then, §§ 67.1830–67.1846 are fully consistent with the idea that cable companies don the mantle of a "public utility" only locally, within the areas in which they are franchised to provide service. For all the reasons we have expressed, the Oggs' first point relied on is also granted.

### *Conclusion*

The circuit court's grant of summary judgment to Mediacom is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

All concur.

**21.** Moreover, Ray County is a county of the third, not the first or second, classification. 2003–2004 OFFICIAL MANUAL, STATE OF MISSOURI 817 (64th ed.2003). This court may rely on the State Official Manual (often referred to as the State "Blue Book") for information of this nature. *See Beatty v. State Tax Comm'n,* 912 S.W.2d 492, 494 (Mo. banc 1995); *Poertner v. Hess,* 646 S.W.2d 753, 755 n. 1 (Mo. banc 1983); *Crenshaw v. Belle,* 571 S.W.2d 234, 234 (Mo. banc 1978). *See also § 48.020; Foster v. Evert,* 774 S.W.2d 472, 473 (Mo. banc 1989) (stating that "Ray County is a third class county").