## HURRICANE DECK HOLDING COMPANY, Appellant,

v.

## PUBLIC SERVICE COMMISSION OF the STATE of Missouri, Respondent.

### No. WD 69643.

Missouri Court of Appeals, Western District.

June 23, 2009.

Gregory David Williams, Esq., Sunrise Beach, MO, for appellant.

Jennifer Leigh Heintz, Esq., Jefferson City, MO, for respondent.

Before ALOK AHUJA, P.J., THOMAS H. NEWTON, C.J., and HAROLD L. LOWENSTEIN, J.

ALOK AHUJA, Judge.

Appellant Hurricane Deck Holding Company appeals a decision of the Circuit Court of Cole County, which denied its petition for review of an adverse decision of the Public Service Commission (the "PSC" or "Commission"). We affirm.

**Factual Background**

The relevant facts are largely undisputed. Hurricane Deck is a Missouri corporation that developed residential subdivisions in Camden County collectively referred to as the Chelsea Rose Service Area ("Chelsea"). In developing these residential areas, Hurricane Deck constructed water and sewer systems, which it owned. Initially, the Osage Water Company ("Osage"), a public utility which held a certificate of convenience and necessity from the PSC, operated these systems and provided water and sewer services to Chelsea's residents. However, at the PSC's request a receiver was appointed for Osage on October 21, 2005.[1]

Hurricane Deck sent a letter to the landowners of Chelsea on December 30, 2005, informing them of Osage's receivership. The letter, written by Hurricane Deck Secretary Debra J. Williams, stated in relevant part:

> Several years ago we entered into an agreement with Osage Water Company to provide operation and maintenance of the water and sewer systems we built for our subdivisions, as [Hurricane Deck President] Greg [Williams] and I did not wish to be in the utility business....

---

1. The PSC's brief states that ownership of Chelsea's water and sewer systems was the subject of a separate lawsuit in Camden County, where the court "ordered [Hurricane Deck] to deed the water and sewer facilities serving" Chelsea to Osage. Hurricane Deck does not argue that the outcome of that separate action should affect the disposition here.

Since [Osage indicated its inability to continue operating] I have been managing temporarily until the systems could be sold.

. . . .

Fortunately, Hurricane Deck Holding Company never transferred ownership of its water and sewer systems to OWC. The receiver has elected not to enter into an agreement providing operation and maintenance to HDHC. . . .

Therefore, we have determined the best course of action at this point is to turn the systems over to the homeowners. Articles of Incorporation [for the Chelsea Rose Landowners Association (the "Association")] have already been filed with the Secretary of State, and a copy is enclosed for your information.[2] Also enclosed is an accounting for the past two (2) months which itemizes a portion of the actual costs for your systems for that period. I have divided the total amount spent by the number of customers (30) and am billing you for that amount, which is due on January 22.

. . . .

The Water Company telephone line has been disconnected, and until the Board [for the Association] is elected you may call . . . me . . . for billing matters.

Attached to this letter was a statement entitled "HDHC/Quarterly Water & Sewer Assessment/September 22—December 30." The statement listed itemized costs for electricity, testing, and a "[l]icensed operator." The statement specified that payment should be made to Hurricane Deck.

On January 23, 2006, the PSC Staff filed a complaint against Hurricane Deck.[3] Staff's Complaint alleged that Hurricane Deck had engaged in the "unlawful provision of water and sewer services to the public, for gain, without certification or other authority from the Missouri Public Service Commission." The Complaint consisted of five counts. The crux of the Complaint was that, "[b]y billing [Osage's] customers in Chelsea Rose Service Area for water and sewer services," Hurricane Deck was functioning as a public-utility water and sewer company, and was thus subject to Commission regulation.

On July 11, 2006, Staff filed a Motion for Summary Disposition, alleging that there were no material disputed facts, and that Staff was entitled to judgment as a matter of law. After the parties had an opportunity to fully brief the motion, the PSC issued an order on August 31, 2006, granting Staff's Motion in part. In granting summary disposition on Counts I, II, III, and V of the Complaint as it pertained to Hurricane Deck, the PSC reached the following conclusions:

> The key fact is that by sending out bills to the residents, Hurricane Deck Holding Company offered service to all residents of the given subdivisions. It is not purporting to merely offer services to a few friends. By offering water and sewer utility services to the public, even if that public is confined to the residents of a few subdivisions, Hurricane Deck Holding Company has made itself subject to regulation as a public utility.
>
> . . . [T]he statutory definitions of water corporation and sewer corporation do not include a requirement that the owner of the corporation actually receive

---

**2.** Hurricane Deck incorporated the nonprofit Chelsea Rose Land Owners Association, Inc. on December 12, 2005.

**3.** Staff's complaint also named the Association and three principals of Hurricane Deck and/or the Association. Staff later voluntarily dismissed all parties except Hurricane Deck.

payment for such services. Rather, the definitions depend upon an intent to supply water or sewer service for gain or compensation. Sending a bill to customers for the provision of water and sewer service meets the definition of operating a system for gain, regardless of whether any customer actually pays the bill.

Staff later dismissed Count IV of its complaint—the sole count on which the PSC had not granted summary disposition—and all parties other than Hurricane Deck, thereby rendering the PSC's summary disposition order a final ruling.

Hurricane Deck sought review of the PSC's Order in the Circuit Court of Cole County, which affirmed on April 22, 2008. Hurricane Deck now appeals to this Court.

### Standard of Review

We recently set forth the applicable standard of review in *State ex rel. Public Counsel v. Public Service Commission*, 274 S.W.3d 569, 573 (Mo.App. W.D.2009) (citations omitted):

> Our review of commission decisions is limited to determining whether or not the commission exceeded its constitutional and statutory authority or otherwise acted unlawfully; whether or not competent and substantial evidence on the whole record supported its decision; whether or not its decision was based on lawful procedure or a fair trial; and whether or not the commission acted arbitrarily, capriciously, unreasonably, or abused its discretion.

■ "An order's lawfulness turns on whether the PSC had the statutory authority to act as it did." *State ex rel. Mobile Home Estates, Inc. v. Pub. Serv. Comm'n*, 921 S.W.2d 5, 9 (Mo.App. W.D.1996).

"When determining whether the PSC's order is lawful, the appellate courts exercise unrestricted, independent judgment and must correct erroneous interpretations of the law." *Id.*

■ "On appeal, this court reviews the decision of the Commission, not the judgment of the trial court." *Deaconess Manor Ass'n v. Pub. Serv. Comm'n*, 994 S.W.2d 602, 608 (Mo.App. W.D.1999). "The Commission's order is presumed to be valid," and "[t]he challenger bears the burden of disproving its validity." *Id.*

### Analysis

Hurricane Deck asserts two Points Relied On, both of which argue that the PSC's order was unlawful in declaring Hurricane Deck to be a water corporation and sewer corporation subject to PSC regulation. In Point I, Hurricane Deck argues that the PSC's order improperly declared it a "public utility" because its conduct "did not constitute or affect a public interest or act and was a private matter." In Point II, Hurricane Deck argues that the PSC's order was also unlawful because "Appellant did not intend to, and did not, provide services for gain."

### I.

"Under Missouri's Public Service Commission Law, public utilities, such as telephone, telegraph, electric, gas, water, and sewer companies, are regulated by the Missouri Public Service Commission on a statewide basis." *Ogg v. Mediacom, L.L.C.*, 142 S.W.3d 801, 813 (Mo.App. W.D. 2004) (footnote omitted). Section 386.020(43)[4] defines "public utility" to include:

---

**4.** In 2008, the legislature amended § 386.020, and altered the numbering of its subsections. We cite the statutory subsections according to this new numbering scheme, as it appears in the RSMo Cumulative Supplement 2008.

[E]very pipeline corporation, gas corporation, electrical corporation, telecommunications company, *water corporation*, heat or refrigerating corporation, and *sewer corporation*, as these terms are defined in this section, and each thereof is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of this chapter[.]

(Emphasis added.) The legislature in turn defined a "sewer corporation" to include:

[E]very corporation ... or person ... owning, operating, controlling or managing any sewer system, plant or property, for the collection, carriage, treatment, or disposal of sewage anywhere within the state for gain, except that the term shall not include sewer systems with fewer than twenty-five outlets[.]

§ 386.020(49). A "water corporation" is defined to include:

[E]very corporation ... and person ... owning, operating, controlling or managing any plant or property, dam or water supply, canal, or power station, distributing or selling for distribution, or selling or supplying for gain any water[.]

§ 386.020(59).

Although the relevant statutory definitions contain no explicit requirement that an entity be operated for a public use in order for it to constitute a "public utility," the Missouri Supreme Court long ago held that such a "public use" requirement was intended:

While the definitions quoted supra [of "electric plant" and "electrical corporation," found now at §§ 386.020(11) and (12),] express therein no word of public use, or necessity that the sale of the electricity be to the public, it is apparent that the words "for public use" are to be understood and to be read therein. For the operation of the electric plant must of necessity be for a public use, and therefore be coupled with a public interest; otherwise the Commission can have no authority whatever over it. The electric plant must, in short, be devoted to a public use before it is subject to public regulation.

*State ex rel. M.O. Danciger & Co. v. Pub. Serv. Comm'n,* 275 Mo. 483, 205 S.W. 36, 38 (1918) (citations omitted). The statutory provisions on which *Danciger* relied remain largely unchanged today, and more recent decisions continue to cite and follow *Danciger*'s holding that facilities must be "devoted to a public use before [they are] subject to public regulation." *See Osage Water Co. v. Miller County Water Auth., Inc.,* 950 S.W.2d 569, 574 (Mo.App. S.D. 1997); *Khulusi v. Sw. Bell Yellow Pages, Inc.,* 916 S.W.2d 227, 232 (Mo.App. W.D. 1995).

We believe the disposition of Hurricane Deck's first Point is controlled by the Southern District's decision in *Osage Water,* which involved Osage's status as a public utility. *Osage Water* found Osage to be a "public utility" based on its sale of water service to the residents of two subdivisions in Camden County. The court stated that facilities could be considered to be "devoted to a public use" within the meaning of *Danciger* where service was " 'indiscriminately and reasonably made available to the general public.' " 950 S.W.2d at 574 (quoting *Marano v. Gibbs,* 45 Ohio St.3d 310, 544 N.E.2d 635, 637 (1989)). *Osage Water* found that test to be satisfied, in terms which are equally applicable here:

The record is void of any testimony which suggested that Defendant has refused to provide water service to any of the residents in the two subdivisions at issue. Indeed, the testimony suggested that Defendant has undertaken the re-

sponsibility to provide water service to everyone within its capability, not merely for particular persons.

. . . .

... [W]e are of the opinion that the nature and operation of Defendant's service brings it within the realm of public utility status. Defendant sells water to the public for compensation, and its actions suggest that it has undertaken the responsibility to provide water service to all members of the public within its capabilities. We believe therefore that Defendant's service has been devoted to public use.

*Id.* at 575.

Similarly, *State ex rel. Cirese v. Public Service Commission,* 178 S.W.2d 788 (Mo. App.1944), held that an entity was a public utility where it solicited electricity customers within a several block area of downtown Kansas City, because it offered its services indiscriminately to all persons within the area it was capable of serving:

[Appellants] are ... engaged in the production, distribution and sale of electricity to the public within the territory of several blocks where their plant and distribution system is located. It follows that the finding of the Commission, to the effect that appellants are engaged in business as a public utility so as to render them amenable to the jurisdiction and regulation of respondent, is fully sustained by the evidence.

In arriving at the foregoing conclusion we have not overlooked appellants' contention that they sold service only on private contract. We think the evidence is sufficient to support a finding to the effect that they held themselves out as willing to sell to all comers who desired service in the immediate vicinity of their plant, a district consisting of several

blocks, and that they did sell to all such customers.

*Id.* at 791.

The Supreme Court's decision in *Danciger* is not to the contrary. In *Danciger,* a brewery operated its own system to generate electricity, and sold the surplus power it generated to "certain private citizens" within the immediate area of its plant, pursuant to "special private contracts." 205 S.W. at 37. Electricity was sold at the brewery's generating plant; the customer was responsible for stringing its own lines to get the electricity from the brewery to the customer's premises. *Id.* at 37–38. The Supreme Court's opinion specifically noted that the brewery had refused to supply electricity to potential customers, even within its three-block "service area":

The record discloses that a number of persons, both within the area of three blocks, and without the same, made requests for service, and were refused, because respondent was, he says, unable to furnish this service by reason of lack of surplus current.

*Id.* at 38.

The brewery subsequently decided to terminate electrical service to a nearby newspaper after it published a pro-Prohibition editorial. *Id.* at 39. The PSC filed a complaint demanding that the brewery reinstate service. *Id.* at 38. On appeal, the Supreme Court held that the brewery was not operating as a public utility. The Court emphasized that "[t]here is in this case no explicit professing of public service, or undertaking to furnish lights or power to the whole public, or even to all persons in that restricted portion thereof who reside within three blocks of the Company's plant." *Id.* at 40. Quoting a leading treatise, the Court emphasized that " '[t]he fundamental characteristic of a public calling is indiscriminate dealing with the general public.' " *Id.* at 42 (citation

omitted). " '[W]here the company supplying electricity has not professed to sell to the public indiscriminately at regular rates, but has from the beginning adopted the policy of entering into special contracts upon its own terms[,] such companies are plainly engaged in private business.' " *Id.* at 41 (citation omitted).[5]

Under *Osage Water* and *Cirese*, Hurricane Deck could constitute a "public utility," even though its services were limited to the two subdivisions in which its water and sewer systems were located, where it offered service indiscriminately to all persons located within that service area. And that is what the PSC found:

> The key fact is that by sending out bills to the residents, Hurricane Deck Holding Company offered service to all residents of the given subdivisions. It is not purporting to merely offer services to a few friends. By offering water and sewer utility services to the public, even if that public is confined to the residents of a few subdivisions, Hurricane Deck Holding Company has made itself subject to regulation as a public utility.

■ Hurricane Deck argues that the PSC merely concluded that its December 2005 letter was tantamount to an "offer of service," and "[t]here was no evidence that Appellant actually provided any water or sewer service to anyone." But in its pleadings, Hurricane Deck *admitted* that it provided both water and sewer services to Chelsea through the systems that it owned. Specifically, in responding to Staff's Motion for Summary Disposition, Hurricane Deck submitted the affidavit of Gregory Williams, its president. In this affidavit, Williams testified that Hurricane Deck "ha[d] received nothing of value as a result of *the operation of its water and sewer utility systems since October of 2005*, and has derived no 'gain' therefrom, but has *borne the expense of operation, maintenance, repair and financing said system.*" (Emphasis added.) Further, the December 2005 letter itself details the costs Hurricane Deck had incurred for the *past* provision of water and sewer services, and states that Hurricane Deck "ha[d] been managing temporarily until the systems could be sold." Accordingly, because Hurricane Deck provided both water and sewer services indiscriminately to all homeowners "within the territory of several blocks[,] . . . [i]t follows that the finding of the Commission, to the effect that appellants are engaged in business as a public utility so as to render them amenable to the jurisdiction and regulation of respondent, is fully sustained by the evidence." *Cirese*, 178 S.W.2d at 791.[6]

5. Hurricane Deck also relies on *Khulusi v. Southwestern Bell Yellow Pages, Inc.*, 916 S.W.2d 227 (Mo.App. W.D.1995). But our decision in *Khulusi*, which found that "[t]he publishing of advertisements in the classified section of a telephone directory" did not render the publisher a "public utility," *id.* at 232, relied primarily on the fact that the publisher did "not provide telecommunications service," because it "does not transmit information by wire, radio, optical cable of electronic impulses." *Id.* at 231. While the Court also held that "[t]he publishing of advertisements in the classified section of a telephone directory is a matter of private contract and is not a public service," *id.* at 232, it did not explain what aspects of the publisher-customer relationship removed it from the realm of a "public use."

6. Hurricane Deck also argues that it was acting as "an authorized agent of Chelsea Rose Landowners Association," not on its own behalf, in taking the actions on which the PSC relied. Because this argument was not raised before the Commission, however, it was waived, and we will not address it. *Blevins Asphalt Constr. Co. v. Dir. of Revenue*, 938 S.W.2d 899, 902 (Mo. banc 1997) (refusing to consider claim by taxpayer which was not raised during prior administrative proceedings; "Generally, administrative actions should not be set aside without an opportunity for the agency, on timely request by the

## II.

Hurricane Deck argues in Point II that the PSC's order was unlawful, because it was not providing services "for gain" within the meaning of §§ 386.020(49) or (59). According to Hurricane Deck, the requirement that a public utility operate "for gain" "must mean that the collections received or intended by the operation of the systems are in excess of the expenditures necessary to operation of those systems."

In concluding that Hurricane Deck was a "public utility," the PSC made specific findings that Hurricane Deck operated the water and sewage systems "for gain":

> Hurricane Deck Holding Company also argues that it is not a public utility because it has never received any payment from customers for the operation of its water and sewer systems. Instead, it contends that the payments that were received from customers were initially turned over to Chelsea Rose Land Owners Association, and ultimately were returned to the customers. However, the statutory definition of water corporation and sewer corporation do not include a requirement that the owner of the corporation actually receive payment for such services. Rather, the definition depends upon an intent to supply water or sewer service for gain or compensation. Sending a bill to customers for the provision of water and sewer service meets the definition of operating a system for gain, regardless of whether any customer actually pays the bill.

Both "water corporation" and "sewer corporation" are defined to include only those entities that "own[ ], operat[e], control[ ] or manag[e] any [water or sewer system] ... for gain." §§ 386.020(49), (59).

"For gain" is not specifically defined in the Public Service Commission Act. However, we do not write on a blank slate: in *Osage Water* the Southern District held that a not-for-profit corporation could fall within the definition of "water corporation" where it was "in the business of operating, managing and providing water service to the public *for compensation.*" 950 S.W.2d at 574 (emphasis added).

We recognize that *Osage Water* offered no specific explanation for equating the terms "for gain" and "for compensation." We nevertheless follow its gloss on the statutory term. First, the dictionary definition of "gain" supports *Osage Water*'s reading: "gain," the noun, is defined to include, *inter alia*, "the act of gaining something," while "gain," the verb, means "to get or attain to possession, control, use, or benefit of (as an advantage) by industry, initiative, merit, or craft: OBTAIN, PROCURE, SECURE § ā sum of money>." WEBSTER'S THIRD NEW INT'L DICTIONARY 928 (unabridged ed.1993); *see also Smith v. Breuer*, 354 Mo. 578, 190 S.W.2d 248, 249 (1945) (recognizing similar definition). These definitions comprehend the operation of a water or sewer system for the purpose of receiving compensation.

We also note that statutory provisions enacted in 1997 now authorize not-for-profit membership organizations to be organized to operate water and sewer systems free of PSC authority. *See generally* §§ 393.825–.861 (sewer companies), 393.900–.954 (water companies). Notably, however, those statutes specify that, without member approval, such entities must annually refund to their membership all revenues received during a fiscal year in excess of their expenses, debt service

complainant, to consider the issue, unless injustice might otherwise result."); *St. Charles County Ambulance Dist. v. Mo. Dep't of Health & Senior Servs.*, 248 S.W.3d 52, 54 (Mo.App. W.D.2008) (same).

costs, and funding of certain reserve accounts and an education fund. §§ 393.849.936. The legislature's creation of these exemptions suggests that, such entities *would* be subject to Commission regulation but for the exemptions; it also suggests that entities not falling within these exemptions may otherwise be subject to PSC jurisdiction. *Cf. Smith v. Mo. Local Gov't Employees Ret. Sys.*, 235 S.W.3d 578, 582 (Mo.App. W.D.2007) (relying on narrow statutory exception to refute claim that legislature intended broader exemption). The new statutory provisions governing nonprofit water and sewer companies provide additional support for *Osage Water*'s reading of the "for gain" criterion of §§ 386.020(49) and (59).

█ Finally, we note that "[t]he purpose of [the public utility] regulatory laws is to allow a utility to recover a just and reasonable return while at the same time protecting the consumer from the natural monopoly power that the public utility might otherwise enjoy as the provider of a public necessity." *State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n*, 165 S.W.3d 160, 161 (Mo. banc 2005); *see also Stopaquila.Org v. Aquila, Inc.*, 180 S.W.3d 24, 34–35 (Mo. App. W.D.2005). Given this overriding statutory purpose, it would be anomalous to hold that, before the Commission could even assert jurisdiction over an entity charging consumers for what otherwise constitute utility services, the Commission would have to determine whether the amounts being charged exceeded the putative utility's costs. Yet that is what Hurricane Deck seeks—a legal rule exempting entities from PSC regulation unless and until the PSC first determined that the entity's "collections ... are in excess of the expenditures necessary to operation of those systems."

Here, it cannot be disputed that, when it sent the December 2005 letter to the Chelsea homeowners, Hurricane Deck "[held] itself out to serve the public for compensation." *Osage Water*, 950 S.W.2d at 574. Hurricane Deck's letter "enclosed [ ] an accounting for the past two (2) months which itemize[d] a portion of the actual costs for [the] systems for that period," which was divided by Chelsea's thirty customers to obtain the amount each homeowner was "bill[ed][ ] for." The attachment identified Hurricane Deck as the party making the assessment, and specified that payment should be made to it.[7] Under these circumstances, and the governing legal standards, we find no error in the Commission decision.

## Conclusion

The PSC did not err in concluding that Hurricane Deck was operating as a "public utility" subject to Commission regulation. The circuit court's judgment is affirmed.

All concur.

---

**7.** While Hurricane Deck emphasizes the PSC's finding that the monies it received in response to the December 2005 letter were deposited in an account of the Association, given that Hurricane Deck's letter itself specified that payment should be made "to HDHC," we cannot accept Hurricane Deck's claim that "there was no evidence that Appellant ever intended to keep funds for itself."