Cite as 2022 Ark. App. 515

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-22-10

| | |
|---|---|
| KATHERINE MCCLERKIN<br>APPELLANT<br><br>V.<br><br><br>ROGUE CONSTRUCTION, LLC<br>APPELLEE | Opinion Delivered December 14, 2022<br><br>APPEAL FROM THE PULASKI<br>COUNTY CIRCUIT COURT,<br>SIXTH DIVISION<br>[NO. 60CV-18-8522]<br><br>HONORABLE TIMOTHY DAVIS FOX,<br>JUDGE<br><br>REVERSED AND REMANDED |

**KENNETH S. HIXSON, Judge**

Appellant Katherine McClerkin appeals from an order of the Pulaski County Circuit Court that granted appellee Rogue Construction, LLC's motion to enforce a settlement agreement between the parties. On appeal, McClerkin argues that the circuit court's finding that the parties entered into an enforceable settlement agreement was clearly erroneous. We agree, and we reverse and remand.

I. *Facts and Procedural History*

In August 2017, McClerkin entered into a contract with Rogue Construction for remodeling work on her house. Problems arose, resulting in this litigation. Rogue Construction filed a complaint against McClerkin alleging that McClerkin breached the contract by failing to pay the amount owed under the contract. Rogue Construction

requested $25,525.92 in damages. McClerkin answered and asserted a counterclaim for breach of contract alleging that she suffered damages in excess of $100,000 when she was required to repair Rogue Construction's allegedly defective work.[1]

The parties attempted to negotiate a settlement of their claims in two separate phases.[2] The first phase began in the summer of 2020, and in June 2020 the parties met for mediation but were unable to reach an agreement. The parties continued to negotiate, and on July 1, 2020, Rogue Construction's counsel sent an email to the circuit court stating that the parties had agreed to a settlement and were working on finalizing the language of the settlement agreement. However, on September 2, 2020, McClerkin's counsel sent an email to the circuit court advising the court that unfortunately the parties could not agree on the release language to be included in the settlement agreement. McClerkin's counsel explained that proposed language provided by Rogue Construction was unilateral in that it released only Rogue Construction from liability but not McClerkin.

The parties continued to negotiate the terms of the settlement agreement to no avail. Finally, on October 20, 2020, Rogue Construction sent a letter to the circuit court advising

---

[1]McClerkin later filed an amendment to counterclaim and second amendment to counterclaim wherein she raised additional claims for negligence and breach of implied warranty and requested additional damages, including consequential damages.

[2]In the first phase of settlement negotiations, Rogue Construction was represented by Jason Davis, and in the second phase, it was represented by G. Spence Fricke, who is Rogue Construction's counsel in this appeal. McClerkin was represented by Jack Wagoner in both phases of the settlement negotiations, and in the latter stages of the second phase, McClerkin was also represented by John Ogles, who is McClerkin's counsel in this appeal.

the court that the parties were ultimately unable to reach a settlement agreement and requested the case be placed back on the active trial docket. Rogue Construction explained to the court that, although the parties had agreed to a monetary amount for the settlement, the parties had not reached an agreement as to which party would pay an outstanding bill of $3434.50 owed to subcontractor Ace Glass for installation of a shower door in McClerkin's master bathroom.

Notwithstanding that the parties had not reached an agreement as to all the material terms of a settlement agreement during the first phase of the negotiations, on October 27, 2020, McClerkin filed a motion to enforce a settlement agreement. Rogue Construction opposed the motion. The circuit court initially granted McClerkin's motion to enforce a settlement agreement on February 5, 2021; however, on February 8, the circuit court set aside the February 5 order and placed the case back on the docket for litigation of any and all issues.

The second phase of settlement negotiations followed. This phase was documented by a series of email exchanges between the parties' attorneys. On April 29, 2021, McClerkin's counsel sent an email to Rogue Construction's counsel stating:

> I think that this case is settled. We will need a release from you as well though. My client has instructed me to tell you that she will withdraw her complaint with the Contractor's Board as you have requested. I just want to talk with you and make sure we're on the same page about everything. . . . I hope to get with you and knock this one out as soon as we can visit.

Later that day, Rogue Construction's counsel evidently had a telephone conversation with McClerkin's counsel, and Rogue Construction's counsel then sent a follow-up email stating:

Jack—I'm confirming we have a settlement for $65,000. I will prepare a mutual release which will include a mutual confidentiality provision, a non-disparagement provision, and an agreement by your client to withdraw her complaint at the Contractor's Licensing Bd, and not re-file it. Please confirm on your end.

McClerkin's counsel replied:

Confirmed. I'll need to see the release language before we sign. But send it to me and I expect we'll just be signing it and sending it back. I know you as an ethical, very talented lawyer. I trust you'll include release language that takes care of both sides.

Rogue Construction's counsel replied, "Understood, and I will try my very best to do that."

Rogue Construction's counsel prepared a "Confidential Settlement Agreement and Mutual Release" consisting of eight paragraphs. The proposed agreement provided that for consideration of $65,000, McClerkin would release Rogue Construction from any and all claims arising out of the design or construction work performed by Rogue Construction. The proposed agreement also provided that the lawsuit would be dismissed with prejudice in its entirety, and that McClerkin would withdraw her pending complaint against Rogue Construction before the Arkansas Contractor's Licensing Board. There were additional provisions covering confidentiality, nondisparagement, mutual release, and no admission of liability. On May 6, 2021, Rogue Construction's counsel sent an email to McClerkin's counsel with an attachment containing the Confidential Settlement Agreement and Mutual Release along with the message, "Jack—attached is the release. I have gone over it with my client and he will agree to it if your client will agree to sign it." Thirteen minutes after receiving that email, McClerkin's counsel responded, "I have a couple of questions. Can you please call me as soon as you get a chance."

4

A few days passed, and the next correspondence between the parties contained in the record occurred on May 11, 2021, when Rogue Construction's counsel sent an email stating:

> Jack—following is language that my client and I can agree to add to paragraph 7 of the release:
>
>> "For the same consideration, McClerkin further agrees that she will be responsible for paying any outstanding bills or other indebtedness for work or services provided by any subcontractor who worked on, or provided materials to, the Construction. To the best of Rogue Construction (formerly Rogue Architecture LLC)'s current knowledge, there are no outstanding balances due to any subcontractors, with the exception of Ace Glass Company, and McClerkin agrees that she will be responsible for, and will pay all sums owed to, Ace Glass Company."

In that email, Rogue Construction's counsel apparently introduced yet a new provision and stated further, "My client is also interested in adding some statement of assurance to the effect that McClerkin will see that there is a final inspection as soon as reasonably possible so that we can close out the construction and he can close his currently open construction permit." Rogue Construction's counsel concluded the email with, "Just let me know if you want to discuss."

The parties exchanged emails again on June 1, 2021. McClerkin's counsel sent an email to Rogue Construction's counsel stating:

> I don't think I have received a new version of the release we discussed a week or two ago. If you have sent one, please resend as it must have gotten lost in my spam folder or something.
>
> This case is giving me anxiety. I need to get this release deal either resolved or we have to pick the case back up and start moving forward with it. I don't want to have to do that when the case was settled. We are giving you a full release. My client has agreed to a release and the $65,000, pay the contractor bill to Ace Glass, and assume

responsibility for any outstanding bills to subcontractors. Rogue affirms that it is not aware of any unpaid subcontractor bills except for Ace Glass.

Can we get on the phone or in person and knock this out? This case stands out among my cases because of the position it is in right now. I feel like I need to get the release situation resolved asap.

Rogue Construction's counsel responded:

Jack I am out of the office right now on vacation. I return to the office next Monday. I do believe I sent you the final version of the release agreement, but by copy of this email I'm asking De'Shae to do that just in case I did not. My client has been very busy over the last week or so and wants to review the release one last time. He is going to be doing that soon and I anticipate we will have a deal in the very near future.

Rogue Construction's counsel subsequently prepared a revised version of the Confidential Settlement Agreement and Mutual Release, which contained identical language as the former version and added a paragraph providing that McClerkin would be responsible for paying any outstanding subcontractor bills. In an email sent on June 8, 2021, Rogue Construction's counsel provided McClerkin's counsel with a copy of the revised version of the proposed agreement along with this message:

Jack—I have now reviewed the attached final release with my client. My client is willing to sign this release if your client is willing. If you will have your client sign and return the signature page to me, I will have my client sign as well, and I will order the check from Hanover. Please also send me the payee information in terms of how the check should be made out as well as a W-9. Just let me know if you want to discuss.

Notably, Rogue Construction never received a response to the above correspondence.

On June 17, 2021, Rogue Construction sent a follow-up email to McClerkin's counsel, who was then still Jack Wagoner, stating, "Jack—just following up." Wagoner did not respond to that email. However, on June 21, 2021, McClerkin acquired additional

counsel, John Ogles.  Now on board, co-counsel[3] Ogles reached out to Rogue Construction's

counsel with an email stating, "I just [got] hired to represent Ms. McClerkin.  I look forward

to working with you and getting this case resolved.  I will be in touch."

On June 30, 2021, Rogue Construction's counsel sent Ogles an email stating, "John—

just checking back.  Are you available this week for a telephone call?  I'd like to get this done

if we possibly can as soon as we can."  Later that day, Ogles responded, "Sorry, I forgot to

call you.  Let's touch base this afternoon.  Do you think we have to mediate again?"  Rogue

Construction's counsel replied:

> Sure.  What's a good time for you?  I'll give you a call.  I'm not going to eliminate all
> possibilities of mediation, but Jack [Wagoner] and I had reached an agreement on the
> amount of money to be paid, $65,000, and we were working on the terms of the
> release, and I thought we had basically gotten agreements on that although no one
> had signed anything.  Do you need to see the latest release that I sent Jack?

Ogles then responded, "No.  I have seen it.  I will not stand in the way of a settlement but I

think she has changed her mind."

Apparently dissatisfied, or perhaps confused, with the response from the new co-

counsel, John Ogles, Rogue Construction's counsel turned around and emailed McClerkin's

existing co-counsel, Jack Wagoner, stating:

> Jack—I have talked to John Ogles and he said he would not stand in the way of a
> settlement agreement.  I thought we had one or at least were very near one.  I am
> resending you again the final release with language that you requested.  My client is
> anxious to settle this and get it done.  Please let me hear from you.

---

[3]While we have referred to Jack Wagoner and John Ogles as "co-counsel," we do not intend to imply any legal relationship between the attorneys except they were both apparently now representing McClerkin going forward.

In response to that email, Wagoner sent Rogue Construction's counsel an email clearly stating that "[w]e don't have an agreement." Among other things, Wagoner stated in the email that there was no agreement because "you keep sending me releases that are not completely mutual." Wagoner stated that there was no settlement and indicated that McClerkin was moving forward with trying the case. This email from Wagoner wherein he confirmed there was no settlement agreement is the last correspondence between the parties contained in the record.

On August 4, 2021, Rogue Construction filed a motion to enforce settlement. In its motion, Rogue Construction alleged that after several years of litigation, the parties agreed to settle their claims for payment of a specific monetary amount and execution of a settlement agreement providing certain terms. Rogue Construction alleged that the parties exchanged various drafts of the agreement and reached an accord on all material terms. Rogue Construction asked the circuit court to order McClerkin to stand by the agreement she negotiated and enter an order enforcing the parties' settlement agreement. Rogue Construction also asked that, in enforcing the settlement, the circuit court dismiss Rogue Construction's claim and McClerkin's counterclaim with prejudice.[4]

On August 23, 2021, McClerkin filed a response to Rogue Construction's motion to enforce settlement, asking that it be denied. McClerkin argued that there was no enforceable

---

[4]Rogue Construction also filed a separate motion to dismiss McClerkin's second amended counterclaim. Rogue Construction never specifically asked to dismiss McClerkin's first amended counterclaim.

settlement agreement because there was no meeting of the minds or mutual agreement on all material terms.

On November 4, 2021, the circuit court entered an order granting Rogue Construction's motion to enforce settlement agreement. The circuit court ordered the parties to execute releases and pay money within thirty days, and the circuit court dismissed the complaint and counterclaim with prejudice. The circuit court denied as moot Rogue Construction's motion to dismiss McClerkin's second amended counterclaim.[5]

## II. *Discussion*

In this appeal, McClerkin argues that the circuit court's November 2021 order should be reversed because the circuit court clearly erred in finding that the parties entered into an enforceable settlement agreement. McClerkin argues that the parties did not reach a full and complete settlement because the parties never reached a mutual agreement as to the language of the releases to be executed by both parties, which was a material part of the agreement.[6] McClerkin argues that there was no binding agreement reached but rather an

---

[5]We observe that there can be no issue as to the finality or appealability of the circuit court's order because in McClerkin's notice of appeal she stated that she abandoned any pending but unresolved claims as required by Rule 3(d)(vi) of the Arkansas Rules of Appellate Procedure–Civil.

[6]In her brief, McClerkin also cites *Terra Land Services, Inc. v. McIntyre*, 2019 Ark. App. 118, 572 S.W.3d 424, where we stated that an attorney may not compromise his client's cause of action without permission. However, McClerkin does not appear to argue on appeal that her attorney did not have permission or lacked authority to negotiate or enter into an agreement on her behalf, and at any rate, such argument would not be preserved because it was not raised below. *See Chastain v. Chastain*, 2012 Ark. App. 73, 388 S.W.3d 495 (stating

9

agreement to engage in continuing negotiations. We agree with McClerkin's argument, and we reverse and remand.

The law favors amicable settlement of controversies, and courts have a duty to encourage rather than discourage compromise as a method of resolving conflicting claims. *Williams v. Davis*, 9 Ark. App. 323, 659 S.W.2d 514 (1983). Nevertheless, a settlement is contractual in nature, and in order to be legally valid, it must possess the essential elements of a contract. *Id.* The essential elements of a contract include (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations. *Billingsley v. Benton NWA Props., LLC*, 2015 Ark. 291. We keep in mind two legal principles in determining whether a valid contract was entered into: (1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract; and (2) it is well settled that in order to make a contract there must be a meeting of the minds as to all terms, using objective indicators. *Alltel Corp. v. Sumner*, 360 Ark. 573, 203 S.W.3d 77 (2005). Whether or not there is a meeting of the minds is an issue of fact, and we do not reverse a circuit court's fact-finding unless it is clearly erroneous. *DaimlerChrysler Corp. v. Smelser*, 375 Ark. 216, 289 S.W.3d 266 (2008). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

---

the well-settled rule that in order to preserve an argument for appeal, the issue must first be raised at the circuit-court level).

During both the first and second phases of the parties' settlement negotiations, the terms of the release language as to both parties was consistently discussed and, ultimately, never mutually agreed upon. In the latter stages of the first phase of negotiations, McClerkin sent an email to the circuit court noting the parties' disagreement as to the content of the release language, and after the first phase of negotiations, the circuit court initially ruled that an enforceable settlement had been reached but then, correctly, set aside that order and the parties' negotiations continued.

In the second phase of the parties' settlement negotiations, McClerkin's counsel advised in an email to Rogue Construction's counsel that he thought the case was settled but that "[w]e will need a release from you as well though." Rogue Construction's counsel responded by stating he would prepare a mutual release, and McClerkin's counsel replied, "*I'll need to see the release language before we sign.*" (Emphasis added.) Several days later, Rogue Construction's counsel sent an email stating that it had drafted a release and would send it for McClerkin's counsel's *review*. On the following day, Rogue Construction's counsel emailed the first version of the Confidential Settlement Agreement and Mutual Release that he had drafted, and advised, "I have gone over it with my client and he will agree to sign it *if your client will agree to sign it*." (Emphasis added.) McClerkin's counsel never assented to the initial settlement agreement drafted by Rogue Construction's counsel; after receiving the proposed agreement, McClerkin's counsel sent an email stating, "I have a couple of questions. Can you please call me as soon as you get a chance?"

Settlement negotiations continued, and two weeks later McClerkin's counsel sent an email stating that "I need to get this release deal either resolved or we have to pick the case back up and start moving forward with it. . . . I feel like I need to get the release situation resolved asap." A week later, Rogue Construction's counsel responded with an email, on June 8, 2021, wherein he attached his revised draft of the Confidential Settlement Agreement and Mutual Release and stated, "My client is willing to sign this release if your client is willing . . . . Just let me know if you want to discuss." McClerkin's counsel did not respond to that email or communicate any agreement as to the settlement language therein.

In Rogue Construction's appellate brief, it posits that the parties' agreement as to the material terms of the settlement were expressed in the final version of the agreement circulated between counsel on June 8, 2021. This final draft contained release terms applicable to McClerkin as well as a mutual release clause applicable to both parties, as follows:

**Release**

1)    That Katherine McClerkin (McClerkin), for and in consideration of the payment to her of the sum of $65,000, the receipt and sufficiency of which are hereby acknowledged, does hereby compromise, settle with, release, acquit and forever discharge Rogue Construction, LLC; Rogue Architecture, LLC; Jeremiah Russell; The Hanover Insurance Company; as well as their predecessors, affiliated companies, successors, agents, servants, officers, directors, employees, partners, insurers, and assigns, and any other person, firm, corporation or association in privity with them (Rogue Parties), or any of them, of and from any and all actions, claims, demands, and causes of action whatsoever, known and unknown, which McClerkin may now have or may have in the future arising out of any and all design or construction work done by Rogue Construction LLC or Rogue Architecture, LLC on McClerkin's residence located at 11040 Rivercrest Drive, Walton Heights neighborhood,

12

Little Rock, AR., (the Construction), said claims being more specifically described in those pleadings and other materials filed and of record in the case of <u>Rogue Construction, LLC v. McClerkin v. Rogue Construction, LLC</u>, Pulaski County Circuit Case Number 60CV-18-8522 (the Lawsuit).

2)    It is the express intention of McClerkin to reserve any rights, claims, or causes of action which she may have against any person other than the Rogue Parties, but to release the Rogue Parties fully and completely.  Therefore, in consideration of the above payment, McClerkin agrees to a reduction of the damages recoverable against all other tortfeasors to the extent of the prorata share of the liability of the Rogue Parties, and further agrees to indemnify, protect and hold harmless the Rogue Parties from all judgments, claims, losses or expenses arising out of or by reason of any action, claim or demand by any person on account of the damages sustained by McClerkin as a result of the Construction, or any liability or alleged liability of the Rogue Parties.  It is specifically intended that the Rogue Parties are and shall be released, indemnified and held harmless with respect to any liability or alleged liability under act 315 of the Acts of Arkansas of 1941, as amended, being the Uniform Contribution Among Tortfeasors Act.  This Release does not release McClerkin from any claims by the Rogue Parties for contribution or indemnity.

3)    For the same consideration, McClerkin covenants and agrees that this Release shall cover, and it does cover and release, any and all claims and demands of any kind whatsoever arising from the Construction, including any and all consequences thereof that may hereafter develop, as well as those already known, developed or that are now apparent that the McClerkin could have asserted against the Rogue Parties.

. . . .

7) **Mutual Release**  McClerkin and the Rogue Parties hereby agree that any and all claims for contribution, fault, defense, damages, requests to be reimbursed for attorney's fees and defense costs, hold harmless, and indemnity by McClerkin or the Rogue Parties against the other are forever released to the extent the defense, damages, request to be reimbursed for attorney's fees, defense costs, hold harmless obligation, and indemnity or contribution obligation arise out of, or are in any way related to the Construction or the Lawsuit.

13

We conclude that Rogue Construction's argument that this version of the agreement was enforceable as to all the material terms is misplaced because, as stated, the record reflects no communication from McClerkin's counsel approving this or any other version that Rogue Construction's counsel had drafted.

Finally, we find it significant that a few weeks after the June 8, 2021, proposed settlement had been communicated without response, McClerkin's newly acquired counsel, John Ogles, sent an email to Rogue Construction's counsel asking, "Do you think we have to mediate again?" Rogue Construction's counsel responded, "Sure. What's a good time for you? I'll give you a call." Rogue Construction's counsel then stated that he and McClerkin's previous counsel, Jack Wagoner, "had reached an agreement on the amount of money to be paid, $65,000, and we were *working on the terms of the release*, and I thought we had basically gotten agreements on that, although no one had signed anything." (Emphasis added.) Later that day when Rogue Construction's counsel emailed Wagoner, he stated that "[m]y client is anxious to settle this and get this done," and Wagoner responded by confirming that "[w]e don't have any agreement" based in part on the absence of a mutual agreement as to the terms of the releases.

It is well settled that in order to make a contract there must be mutual agreement and a meeting of the finds as to all terms. *See Alltel Corp.*, *supra*. We hold on this record that the circuit court clearly erred in finding that the parties reached any mutual agreement as to the release language of a settlement and, therefore, that the circuit court's order enforcing the settlement agreement must be reversed and the case remanded for further proceedings.

14

Reversed and remanded.

HARRISON, C.J., and BROWN, J., agree.

*Ogles Law Firm, P.A.*, by: *John Ogles*, for appellant.

*Barber Law Firm, PLLC*, by: *G. Spence Fricke* and *Jerry D. Garner*, for appellee.