Cite as 2024 Ark. App. 142

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CV-23-115

| | | |
|---|---|---|
| ROGER RILEY | | **Opinion Delivered** February 28, 2024 |
| | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTEENTH DIVISION [NO. 60CV-20-5701] |
| V. | | |
| FIRST STATE BANK | | HONORABLE MACKIE M. PIERCE, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## RITA W. GRUBER, Judge

Roger Riley appeals the October 27, 2022 order of the Pulaski County Circuit Court denying his motion to enforce an alleged settlement agreement with appellee First State Bank of Lonoke. Roger raises two points on appeal: (1) the circuit court erred in excluding evidence of communications demonstrating that there was a settlement; and (2) the circuit court's judgment is clearly erroneous and should be reversed. We affirm.

### I. *Factual and Procedural Background*

On October 13, 2020, the bank filed a complaint against Roger and his then wife, Pamela D. Riley. The bank alleged that on April 11, 2018, the Rileys and their corporation, Enviro-Air Filtration Industries, Inc., d/b/a Razorback Air Filter, executed a promissory note in favor of the bank in the amount of $140,000. The bank further alleged that a second promissory note was executed in the amount of $50,000 on December 5, 2018. The bank—

asserting that both notes have been in default since January 13, 2020—requested a judgment against the Rileys, jointly and severally, in the amount of $171,636.33 plus interest, costs, and attorney's fees.

On November 3, 2020, Roger filed an answer, a cross-complaint against Pamela, and a motion for consolidation and contempt. His answer admitted the existence of the notes and the lack of payments on them. In his cross-complaint, Roger alleged that he and Pamela were divorced on May 5, 2020, and that their divorce decree contained a property settlement agreement (PSA). He further alleged that the PSA required Pamela to assume all responsibility for the notes, indemnify Roger for any liability or obligation owed on the notes, and take whatever steps necessary to refinance the notes in her name only. Roger alleged that Pamela was in breach of the PSA and requested that he be awarded damages against Pamela for any amount assessed against him, either individually or jointly and severally. The bank responded to Roger's motion for consolidation and contempt on November 20, 2020, generally opposing the relief he requested. The record does not reflect that Pamela answered either the bank's complaint or Roger's cross-complaint.

On August 12, 2022, Roger filed a motion for default judgment against Pamela, alleging that she had been properly served the cross-complaint and summons and had failed to file any answer or responsive pleading. On August 18, the bank filed its own motion for default judgment, also alleging that Pamela had been properly served its complaint and summons and failed to file an answer or responsive pleading.

A hearing was held on September 6, 2022. The circuit court denied Roger's motion to consolidate, granted the bank's motion for default against Pamela, and reserved ruling on Roger's motion for default. Those rulings were memorialized in a September 20, 2022 order.

On September 23, Roger to enforce the settlement agreement and incorporated brief. The motion alleged that Roger and the bank had reached a settlement agreement regarding the bank's claims against him via the email negotiations of their respective counsels, but the bank was refusing to honor the agreement. Roger attached several emails to his motion.

The bank responded on September 27, first arguing that the emails were inadmissible under Arkansas Rule of Evidence 408. The bank then asserted that Roger had not set forth the entirety of the email exchanges between their counsel, focusing on an email from Roger's counsel that submitted a proposed settlement agreement and release for examination by the bank's counsel and requested that the bank's counsel advise if any changes were requested. The bank further asserted that there were additional email communications in which the bank's counsel had made clear that the bank would not agree to the proposed release because the release did not include provisions regarding tax liability and failed to address one of the two notes at issue. Those additional emails were attached to the bank's response. The bank argued that because a final release had not been agreed on, no agreement had been reached, as acknowledged by Roger's counsel in an email.

A final hearing was held on September 29, 2022. The emails at issue were admitted for purposes of the motion to enforce the settlement agreement only and reviewed by the court. Those emails reflect the following.

3

On December 8, 2021, Roger's counsel made an offer of compromise and settlement to fully resolve the claims against Roger in exchange for $12,500, with a lump sum payment of $4,000 by December 12, 2021, and the remaining balance of $8,500 in monthly installments of $1,000. On December 14, the bank's counsel rejected Roger's offer of settlement with a counteroffer: the bank would settle the claims against Roger in exchange for $24,00, with a lump sum payment of $4,000 by the end of the week, and the balance of $20,000 payable over a twenty-four-month period at $833.33 per month at no interest. The offer would expire on Friday, December 17, 2021, at noon. On December 21, Roger's counsel asked that the bank's offer deadline be extended for "another week."

On January 14, 2022, the bank's counsel stated that if there was no interest in settling the claim, it would ask that the matter be set for trial. On January 18, Roger's counsel rejected the bank's counteroffer with its own counteroffer: full and final settlement of all claims in exchange for a lump-sum payment of $12,500. Roger's counsel asked, "[I]f a settlement did happen with Mr. Riley, . . . [is the bank] going to continue to pursue the claim against Pam?"

On January 24, the bank's counsel stated that it was willing to accept Roger's offer, provided Roger made the payment before February 1. Roger's counsel responded that same day. He accepted the terms, requested that the bank provide him with a "settlement/release," and asked how the bank wanted the payment made. He also proposed that the bank draft an order dismissing Roger with prejudice once the payment was deposited but stated that Roger would remain a party to the cross-claim against Pamela.

On January 25, the bank's counsel requested that the settlement payment be made by cashier's check payable to "First State Bank, Lonoke, AR." That same day, Roger's counsel emailed a release for the bank's counsel's review, stating that if it was acceptable, to please have the bank sign and return it, but if there were any changes in the release, to "please advise." Additionally, Roger's counsel informed the bank's counsel that a cashier's check should be in Roger's counsel's office no later than January 28, 2022.

On January 26, 2022, Roger's counsel inquired as to the status of the release, asking if there were any changes and informing the bank's counsel that the settlement payment would be at Roger's counsel's office by Friday, January 28, 2022, and could be picked up then, unless the bank wished to wait until Monday, January 31, 2022, for it to be sent via mail.

On February 7, 2022, Roger's counsel requested a status update on the proposed settlement, stating that the agreement was for $12,500 in exchange for a full and final settlement, and Roger would not now agree to any tax liability for the remainder of any outstanding debt alleged. Roger's counsel further relayed that if the bank wanted to issue a 1099 because of any loss, it could be issued to Pamela. Roger's counsel recognized that the previous release had not addressed the second note, but the omission had been corrected, and an amended proposed release was attached. Roger's counsel stated that the signed release would be required prior to remittance of the settlement payment.

On February 17, Roger's counsel asked the bank's counsel where they were on settlement and stated that the payment remained in his possession. The bank's counsel

5

responded that the case would need to be set for trial. That same day, Roger's counsel sent a second email to the bank's counsel setting out his belief that a binding and enforceable settlement agreement currently existed between their two clients, but that, in "an effort to avoid litigation and/or bankruptcy," Roger was "prepared to make a new proposal" that should in "no way be deemed a waiver of any claim to enforce said agreement should this 'new' proposal be rejected." The following terms were proposed:

a) Payment by Cashier's Check in the amount of $12,500.00 within two (2) business days following receipt of a fully executed release. Plaintiff shall be responsible for providing a courier to take possession of the Cashier's Check;

b) Acknowledgment and declaration in the release that Mr. Riley is only indebted to First State Bank for one-half of the outstanding principal and interest of the loan(s) which form the basis for the lawsuit between the parties pending in Lonoke, AR.

c) Acknowledgment in the release by Mr. Riley that as additional consideration for the settlement First State Bank is entitled and shall issue a 1099C to Mr. Riley for cancellation of the acknowledged amount of outstanding indebtedness specifically referred in Paragraph (b) above.

d) The total amount of the acknowledged indebtedness as referred to in Paragraph (b) above shall be calculated as February 17, 2022.

e) Acceptance of this proposal by electronic mail shall be binding on all parties and shall be enforceable at law and equity.

This offer was good until the following day at noon.

Having reviewed the emails, the circuit court then ruled that the parties had come close but never consummated a deal that was enforceable. It denied the motion to enforce settlement, emphasizing the lack of a signed release. The circuit court's oral rulings were memorialized in an October 27, 2022 judgment that reflected Roger's motion was denied

6

because there was no meeting of the minds. It further reflected that Arkansas Rule of Evidence 408 provides that no evidence of conduct or statements made in compromised negotiations is admissible. The judgment stated that the notes required Roger and Pamela to be jointly and severally liable to the bank in the event of default; the notes were in default; and the bank was entitled to declare all indebtedness immediately due and payable. The judgment awarded the bank a total of $226,250.39 on the two notes with postjudgment interest at a rate of 17 percent per year. Roger and Pamela were also ordered to pay $10,000 in attorney's fees. In recognition of the indemnification provision of Roger and Pamela's PSA, the judgment granted Roger judgment against Pamela for any amounts paid by him to the bank, including any attorney's fees and costs, whether paid voluntarily or by way of execution. This timely appeal followed.

## II. *Standards of Review*

We review evidentiary errors under an abuse-of-discretion standard, and the circuit court's findings will not be disturbed on appeal unless there has been a manifest abuse of discretion. *Potter v. Holmes*, 2020 Ark. App. 391, at 7, 609 S.W.3d 422, 427. Moreover, we will not find an abuse of discretion unless a circuit court acted "improvidently, thoughtlessly, or without due consideration." *Id.*

The law favors amicable settlement of controversies, and courts have a duty to encourage rather than discourage compromise as a method of resolving conflicting claims. *Terra Land Servs., Inc. v. McIntyre*, 2019 Ark. App. 118, at 12, 572 S.W.3d 424, 432. Nevertheless, a settlement is contractual in nature, and to be legally valid, it must possess the

essential elements of a contract. *Id.* The essential elements of a contract are (1) competent parties; (2) subject matter; (3) legal consideration; (4) mutual agreement; and (5) mutual obligation. *Id.* A court cannot make the parties' contract but instead can only construe and enforce that contract the parties have made. *Id.* There must be a meeting of the minds to have a valid contract, using objective indicators: if there is no meeting of the minds, there is no contract. *Id.* Whether there is a meeting of the minds is a question of fact. *Id.*

On appeal, the circuit court's findings of fact will not be reversed unless they are clearly erroneous. *Id.* at 12–13, 572 S.W.3d at 432. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* at 12, 572 S.W.3d at 431. Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Id.*, 572 S.W.3d at 431–32.

### III. *Points on Appeal*

Roger first contends on appeal that the circuit court erred when it ruled that the emails were inadmissible. He argues that the emails were admissible pursuant to Arkansas Rule of Evidence 408 as well as several other rules of evidence and doctrines. The bank responds that the only real issue on appeal is whether the parties, through their respective counsels, reached a full settlement of the lawsuit. The bank does not take issue with the admission of the emails for the purpose of showing whether a settlement was reached. Rather, it argues that in circumstances such as these, where there was no settlement reached,

the emails are not admissible at a trial on the merits, which is what the judgment reflected. In other words, the emails were *no longer* admissible.

Arkansas Rule of Evidence 408 provides that "evidence of conduct or statements made in compromise negotiations" are not admissible for purposes of proving liability. The rule, however, allows evidence of settlement negotiations to be offered for other purposes, including whether the parties have agreed to settle. *Roberts v. Green Bay Packaging, Inc.*, 101 Ark. App. 160, 162–63, 272 S.W.3d 125, 128 (2008).

Here, the issue was whether the parties had agreed to settle. Roger is correct that the emails were admissible for making that determination. But the Bank is also correct. The record makes clear that the emails *were* admitted—solely for the purposes of Roger's motion— and were considered by the circuit court prior to its determination that no agreement had been reached. The emails were ruled inadmissible only after the circuit court had reviewed them in connection with Roger's motion. And the record does not reflect that the emails would have been subsequently admissible for any other purpose. As such, the circuit court did not abuse its discretion in ruling as it did regarding the admissibility of the emails.

Roger next contends that the circuit court's judgment was clearly erroneous and should be reversed. He argues that a settlement agreement was reached, as proved by the plain and ordinary language contained in the email exchanges. He further argues that even if the existence of the settlement was unclear, "parol evidence through Roger's attorney showed its existence." The cases cited by Roger in support of his argument do not support

his position; rather, they merely set forth the legal standard for determining whether an agreement was reached and the applicable standard of review on appeal.

The bank responds that the emails make clear that no meeting of the minds occurred; thus, no agreement was reached. The bank relies primarily on *McClerkin v. Rogue Construction, LLC*, 2022 Ark. App. 515, *Chadick v. Walters*, 2022 Ark. App. 423, 654 S.W.3d 837, and *Terra Land Services, Inc.*, 2019 Ark. App. 118, 572 S.W.3d 424. These cases are apposite and persuasive.

In *Terra Land Services*, the issue was whether the parties reached a full and complete settlement agreement. There, the circuit court determined that the parties had. 2019 Ark. App. 118, at 1, 572 S.W.3d at 426. On appeal, we reversed and remanded, holding that the circuit court erred in granting the appellee's motion to enforce settlement. *Id.* at 16, 572 S.W.3d at 433. In doing so, we reviewed the "rapid-fire emails, faxes, and telephone calls from October 27 to November 7, 2017, between the parties' separate counsel." *Id.* at 6, 572 S.W.3d at 433. We concluded that because additional financial information was still being requested, no meeting of the minds had occurred. *Id.* at 14, 572 S.W.3d at 433. We explained that the issue then became whether appellant's attorney had the authority to bind his client. *Id.* at 15, 572 S.W.3d at 433. We concluded that the attorney did not, emphasizing the lack of specific authority contained within the record as well as the steadfast refusal by

one of the parties to sign any agreement or acknowledgment.[1] *Id.* at 15–16, 572 S.W.3d at 433.

The issue in *Chaddick*—a property-dispute case—was also whether the parties reached a full and complete settlement agreement of their claims, specifically, whether there was a meeting of the minds as to all terms of the contract. 2022 Ark. App. 423, 654 S.W.3d 837. There again, the circuit court determined that the parties had an enforceable agreement, finding that the parties had agreed that in exchange for a sum certain, property was going to be purchased but recognizing that there were still some details to be worked out regarding specific performance. *Id.* at 4–5, 654 S.W.3d at 839. The circuit court then ordered the parties to sign a version of the agreement that one of the parties had communicated was unacceptable due to the inclusion of an unsatisfactory specific-performance provision, with the circuit court subsequently adding additional terms to the agreement itself. *Id.* at 9, 654 S.W.3d at 841. We reversed, holding that the circuit court erred in granting the appellee's motion to enforce settlement. *Id.* at 10, 654 S.W.3d at 842. In doing so, we once more emphasized that because "the parties did not agree on *all the terms* of the agreement, there was no meeting of the minds." *Id.* at 9–10, 654 S.W.3d at 842 (emphasis added).

---

[1]Roger briefly raises the concept that an attorney may bind his client if acting within the authority granted to the attorney, but he does so initially in the section of his brief addressing the admissibility of the emails. The only reference to this concept under his second point on appeal is a single conclusory sentence at the very end of his brief: "The Bank is bound by the contract its attorney agreed to. *Dewitt v. Johnson*, 349 Ark. 294, 77 S.W.3d 530 (2002)." This was not raised as a stand-alone issue or argument—either to the circuit court or this court—and no persuasive arguments are made in that regard.

Last, whether the parties reached a full and complete settlement agreement was at issue in *McClerkin*—a case in which the underlying contractual dispute centered on a house remodel. 2022 Ark. App. 515, at 1. Once more, the circuit court determined that an enforceable settlement agreement existed. *Id.* There, the appellant argued that the circuit court erred because the parties "never reached a mutual agreement as to the language of the releases to be executed by both parties, which was a material part of the agreement." *Id.* at 9. We agreed, ultimately reversing and remanding. *Id.* at 14–15. In doing so, we emphasized that an enforceable contract requires "a meeting of the minds as to *all terms*, using objective indicators." *Id.* at 10. (emphasis added). We concluded that this had not occurred, noting the ongoing communications between the parties' respective attorneys regarding the release language, the lack of agreement regarding such, as well as the lack of release signatures. *Id.*

Here, the emails exchanged make clear that neither party was fully satisfied with any version of the proposed release. Roger's counsel clearly contemplated that the Bank may request revisions to the release, given his express inquiry regarding such. Thus, it should not have come as a surprise when the Bank did just that with respect to the tax liability and the issuance of a 1099. Moreover, it was Roger's counsel who objected in the first instance to the inclusion of the tax-liability language in the release. The emails reflect that, even assuming the Bank's counsel had carte blanche authority to negotiate and agree to any terms he believed were warranted, there was clearly no agreement between the attorneys, let alone the parties, regarding tax liability.

12

The parties did not have a fully fleshed-out agreement, such that it could be enforced by a court of law. The objective indicators present did not demonstrate a completed deal. The emails make clear that no meeting of the minds occurred because neither party had manifested assent to all the particular terms of the release. *See Chadick*, *supra* (citing *DaimlerChrysler Corp. v. Smelser*, 375 Ark. 216, 289 S.W.3d 466 (2008)). The lack of assent to all terms is also made clear by the lack of a signature on any release by *either* party.[2] Simply put, there was still work to be done. Thus, the circuit court did not err in concluding that the parties had not reached an agreement. Accordingly, we affirm.

Affirmed.

GLADWIN and BARRETT, JJ., agree.

*Robert S. Tschiemer*, for appellant.

*Stuart Law Firm, P.A.*, by: *J. Michael Stuart*, for appellee.

---

[2]We recognize that an enforceable oral agreement may be struck under certain circumstances, but that is not the case here.